**Appeal No. 17-1384**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

SOURCE SEARCH TECHNOLOGIES, LLC, Plaintiff-Appellant,

v.

KAYAK SOFTWARE CORPORATION, Defendant-Appellee

Appeal from the United States District Court
District of New Jersey
Case No. 11-cv-3388
Judge Noel Hillman

## CORRECTED BRIEF OF PLAINTIFF-APPELLANT SOURCE SEARCH TECHNOLOGIES, LLC

Jeffrey I. Kaplan, Esq.
KAPLAN BREYER SCHWARZ
& OTTESEN, LLP
100 Matawan Road Suite 120
Matawan, New Jersey 07747
Telephone: (732) 578-0103
Facsimile: (732) 578-0104
jkaplan@kbsolaw.com

# CERTIFICATE OF INTEREST

Counsel for the Appellant SOURCE SEARCH TECHNOLOGIES, LLC certifies the following:

1. The full name of every party or amicus represented by me is:

   SOURCE SEARCH TECHNOLOGIES, LLC

2. The name of the real party in interest represented by me is:

   SOURCE SEARCH TECHNOLOGIES, LLC

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   Jeffrey I. Kaplan
   Daniel Basov
   Kaplan Breyer Schwarz & Ottesen, LLP
   100 Matawan Rd, Ste 120
   Matawan, NJ 07747

   Sorin Royer Cooper, LLC
   2 Tower Center Blvd
   East Brunswick, NJ 08816
   (firm no longer exists)

January 6, 2017

Jeffrey I. Kaplan
Attorney for Appellant

# TABLE OF CONTENTS

**PAGE(S)**

I. STATEMENT OF RELATED CASES....................1

II. JURISDICTIONAL STATEMENT....................1

III. STATEMENT OF THE ISSUES....................2

IV. STATEMENT OF THE CASE....................2

A. The Patent at Issue....................2

B. Procedural History....................11

1) Proceedings Prior to the Fee Opinion....................11

2) KAYAK'S Attorneys' Fees Motion....................14

V. SUMMARY OF ARGUMENT....................18

VI. ARGUMENT....................19

A. SST's *Alice* Opposition Did Not Contradict the *Markman* Position But Instead Reaffirmed the *Markman* Position....................20

1) The District Court Reaffirmed the Error in its Reconsideration Opinion....................28

B. The District Court Misunderstood SST's Use of "Specialized"....................33

C. SST's Citation of the Patent Office Footnote Does Not Support the Exceptional Case Finding....................37

D. No Other Conduct Supports an Exceptional Case Finding....................41

VII. CONCLUSION....................43

# TABLE OF AUTHORITIES

## Cases

*Alice Corp. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014)........................................................................ passim

*AntiCancer, Inc. v. Pfizer, Inc.*,
769 F.3d 1323, 1328 (Fed. Cir. 2014)..........................................................19

*Bascom Global Internet v. AT&T Mobility LLC*,
827 F.3d 1341(Fed. Cir. 2016)............................................................. 31, 32

*Biax Corp. v. Nvidia Corp.*,
626 Fed. Appx 968 (Fed. Cir. 2015)..................................................... 20, 33

*Clarilogic Corp. v. Formfree Holdings, Inc.*,
15-cv-41, slip op. (S.D. Cal. April 27, 2016)...............................................42

*Credit Acceptance Corp. v. Westlake Services*, LLC,
13-cv-1523, slip. op. (C.D. Cal. Nov. 2, 2015)...........................................42

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014)............................................................. passim

*Gaymar Industries, Inc. v. Cincinnati Sub-Zero Products, Inc.*,
790 F.3d 1369, 1375 (Fed. Cir. 2015).................................................... 20, 33

*Robert Bosch, LLC v. Pylon Manufacturing Corp.*,
659 F.3d 1142 (Fed. Cir. 2011)...................................................................19

*Source Search Technologies, LLC v. Lendingtree et al.*
2006 WL 2990363 *6-7 (D.N.J. October 16, 2006)......................................11

*Source Search Technologies, LLC v. Lendingtree et al.*,
2008 WL 5638262 (D. N.J. July 8, 2008)............................................. 11, 12

*Source Search Technologies, LLC v. LendingTree LLC*,
588 F.3d 1063 (Fed. Cir. 2009)..................................................... 1, 3, 10, 12

*Source Search Technologies, LLC v. Zillow Corp.*,
2:10-cv-2717, (D. N.J. 2011)........................................................................1

**Statutes**

35 U.S.C. §101.......................................................................................... 11, 13

28 U.S.C. §1295..............................................................................................2

35 U.S.C. §271................................................................................................2

## I. STATEMENT OF RELATED CASES

This Court previously decided *Source Search Technologies, LLC v. LendingTree et al*., 2008-1505, 2008-1524, December 7, 2009, which concerned the same US Patent No. 5,758,328 at issue here. That decision was issued by a panel comprising Judges Rader, Plager, and Schall, and is reported at *Source Search Technologies, LLC v. LendingTree LLC*, 588 F.3d 1063 (Fed. Cir. 2009). The same patent was also the subject of a subsequent litigation, *Source Search Technologies, LLC v. Zillow Corp.*, 2:10-cv-2717, in the District of New Jersey. That case settled in or about May, 2011.

## II. JURISDICTIONAL STATEMENT

This case arises under 35 U.S.C. et. seq. On April 26, 2016, Source Search Technologies, LLC ("SST") filed a Notice of Appeal from an Order entered March 31, 2016, granting in part KAYAK Software Corporation's ("KAYAK") motion to declare the case exceptional pursuant to 35 U.S.C. §285 and for attorneys' fees. SST's appeal of that Order was dismissed as premature. (Appeal No. 16-1928, Doc. 21). On December 20, 2016, the district court entered final judgment in the amount of $578,085.05 in KAYAK's favor and denied SST's motion for reconsideration. (Appx30-56). The present appeal results from a second Notice of Appeal SST filed on December 20, 2016, appealing that final judgment.

This Court has subject matter and appellate jurisdiction pursuant to 35 U.S.C. §271 and 28 U.S.C. §1295.

## III. STATEMENT OF THE ISSUES

1. Did the District Court err in declaring that, when KAYAK filed a motion for summary judgment based upon *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014) ("*Alice*"), and just shortly after the Supreme Court decided *Alice*, SST's failure to immediately discontinue the litigation without filing a response to the motion rendered the case exceptional and warranted an award of attorneys' fees?

## IV. STATEMENT OF THE CASE[1]

### A. The Patent At Issue

This case concerns SST's U.S. Patent No. 5,758,328 ("the '328 patent") entitled "Computerized Quotation System." (Appx69-85). The district court held that asserted claims 12 and 20 were invalid as abstract ideas under *Alice*

[1] During the district court proceedings, the parties filed two appendices, one in connection with the *Markman* briefing, and a second in connection with certain limited proceedings that took place before a special master. The appendices were cited as JA and SM, respectively. Many of the briefs and court opinions from the district court cite to those two appendices. Therefore, although all the pages of the joint appendix filed with this appeal are numbered as appropriate for this appeal, we have left the prior JA and SM numbers on the pages so that it is clear to where those lower court opinions and briefs below are citing. Where appropriate to avoid confusion in this brief, we parallel cite to both the Appx number applicable here, and to the corresponding JA or SM number.

(Appx1493-1524), and then issued a subsequent order declaring the case exceptional and awarding attorneys' fees. (Appx1-44, "Fee Opinion"). Although SST has appealed only the exceptional case finding and award of attorneys' fees, a discussion of the underlying merits is necessary for a full understanding of the error in the exceptional case finding.

The '328 patent was filed in February, 1996, and discloses one of the earliest e-commerce systems for providing online quotes for goods and services, and permitting online purchasing. The parties here stipulated that a '328 quote, as that term is used in claims 12 and 20 at issue, is "the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance." (Appx1361). That is, the quote is all the contractually material terms and conditions of an offer. That definition was previously adopted by the district court in SST's prior litigation against LendingTree, and not challenged in the prior appeal to this Court. *Source Search Technologies LLC,* 588 F.3d, at 1072.

Prior to the invention of the technology claimed in the '328 patent, e-commerce systems allowing purchase of goods from any one of numerous vendors typically worked via the use of a "central database." The central database system was one in which a number of vendors would store, in a single central database, in advance of the quoting process, the price and all of the other commercially material terms on which they would be willing to sell their numerous products.

That data would be entered either manually, by a system operator based upon information received from vendors, or by the vendors directly, into whatever single database structure and form was used by the central computer. (Appx1352, col. 10, lines 46-53).

During subsequent system use, a potential buyer connected via a computer network to the central computer database, and searched for what she wanted to purchase. The system would select vendors from which to source the product, and then display quotes from those selected vendors. (Appx1346). The buyer could then choose a vendor and complete the purchase. (Appx1339, Appx1350, col. 6, lines 26-37). After the purchase, the system would notify the vendor to ship the product. (Appx1351, col. 8, lines 25-37).

This type of prior art system, in which the transaction is essentially completed between the buyer and a central computer using previously uploaded vendor product information, is described in U.S. Patent No. 4,992,940 to Dworkin (Appx1338-1353), and was cited and discussed extensively during prosecution of the ‘328 patent and the reexamination. (e.g.; Appx79, col. 1, Appx223, Appx225, Appx286-287, Appx310, Appx874-875, Appx911, Appx1101, Appx1227-1228).

It is shown pictorially below:




As described in the ‘328 patent, such systems were problematic in that they required the central database to contain, at the time of purchase, all the information about all the products from all of the vendors so that the transaction could be completed between the consumer and the central database as shown above. (Appx79, col. 1, lines 42-60, Appx317-318). As the ‘328 patent explains, keeping such a large central database current and properly managed was very difficult due to the large number of products available from each of a potentially large number of vendors, and the ever changing and fluid details of each product or service offered by such vendors. (Appx79, col. 1, lines 42-60).

In the ‘328 patent, a central computer is used to store information specified by various vendors of goods and services, who may be located anywhere. The information input in advance by vendors, called “vendor filter conditions,” specifies parameters of the products that a vendor sells, and optionally, the types of buyers with whom the vendor would like to deal and/or the types of transactions in which the vendor would like to engage (*e.g.*; minimum volume of purchase required, location of buyer, etc.). (Appx79-80, Summary of the Invention).

The central computer does not need to store all the somewhat fluid information about all the items from all the vendors because the central computer system of the ‘328 patent does not complete the transaction with the consumer. Instead, a buyer wishing to purchase a product enters a Request for Quote (“RFQ”) into his own computer. The RFQ specifies the product desired, as well as some additional “filter conditions” of the buyer, and is transmitted over a data network to the central computer. The central computer then filters the RFQ and matches the RFQ with vendors potentially capable of selling the requested item on the buyer-specified terms. (Appx85, claims 12, 20, Appx224-225, Appx309).

Thereafter, responsive to the previous step of filtering, the central computer interfaces to one or more selected vendor-associated computers to assemble the information needed to generate a quote, and the quotes are then returned to the buyer. (Appx85, claims 12, 20, Appx224-225, Appx309, Appx317, Appx321).

The prior art problem of the unmanageably large and cumbersome central database system that has to include every detail of every item, from every vendor, and manage all the sales, including all of the continuously occurring changes to the information of at least some of the items, is eliminated. This centralized storage of data is avoided, and each vendor need not enter its data using whatever database format is at the central database. Instead, each vendor only needs to keep its own database current.

The '328 type of system is shown conceptually below:




An important aspect of the '328 invention is the specialized, predefined software interface, labeled in the figure above, positioned in the patented system between the central computer and each of the vendor computers. Specifically, because all contractually material terms of a quote are retrieved by the central computer in response to the RFQ, there must be some predetermined protocol and data structure between each different vendor computer and the central computer.

These interfaces are arranged in advance, with knowledge of, for example, what terms upon which each vendor will do business, where and in what format and using what database structure the product details will be stored at each vendor computer, what database system each of the vendors uses, and how the central computer will access it.

Moreover, not only do the database structures, formats, and terms differ among vendors, but different products also inherently involve different contractually material terms. For example, an offer to provide a mortgage loan would typically include material terms such as points, application fee, interest rate, etc., whereas an offer to sell a computer might include terms such as storage capacity, speed, operating system, etc.

Thus, the interface between each vendor computer and the central computer needs to be pre-arranged with that vendor to ensure that the system knows which contractually material terms go with each product, and the particular structure, location, and database format in which each of the different vendor computers will store all contractually material terms for any particular product. Absent such a software interface customized for each vendor, the central computer would not know which material terms go with which products, where to find, in all the different vendor databases, the return policy, the shipping terms, the shipping

times, etc., or in what database format or structure those terms may be stored, or even which terms were stored there at all.

As the ‘328 patent explains, software installed at the vendor computers and/or the central computer, <u>in advance</u> of the quoting process, allows the central computer to obtain and forward many terms of the offer, by, for example, accessing each vendor’s product database and retrieving pricing “and other information necessary” to complete the material terms of an offer. (Appx81, col. 5, lines 36–64). The ‘328 patent further notes that this software “interrigate[s] [sic] the vendor’s product database” to retrieve the quote terms. Programming “for the buyer’s and vendor’s computer type equipment would be appropriate to the variety of goods and services buyers and vendors wish to sell over the network and would change as new goods and services come into existence and old ones are discontinued” so that the proper terms for the particular product at issue may be obtained. (Appx81, col. 6, lines 46–51).

Figure 7 of the ‘328 patent shows a data structure that may be used for this purpose. (Appx77). Fig. 8 shows the full quote that can be returned, without the system having to store all those terms from all the vendors in a central database (Appx78):

```
PRICE QUOTATION
RFQ DATE: 07/02/1993                                    TRACKING NO : 1016
PROD. TYPE NO. : 12432                                  ROUTING TO : NEW JERSEY
PROD. CATEGORY : RESISTORS                              PROD. CODE : 4800
PRODUCT NAME   : TYPE J RESISTOR 5%
PRODUCT NUMBER : 0H006-2000656
MANUFACTURER : OHMITE
QUANTITY        : 5,000        PIECES                   DELIVERY DATE : 08/01/1993
NOTES : DELIVERY DATE IS FIRM.

QUOTE DATE : 07/03/1993 VENDOR NO.  : 456546
VENDOR NAME : ACME RESISTIOR SUPPLY, INC.
CONTACT     : JOHN MURRAY                                   UNIT PRICE :     0.28
VENDOR PHONE : 515 222-3333                          5,000 PIECE      = 1,400.00
VENDOR FAX    : 515 222-3056                               SALES TAX  :     0.00
CAN SHIP BY : 07/03/1993                                  UPS GROUND :    26.00
                                                                   = ========
                                                                     1,426.00

VENDOR NOTES : SHIPPED 1000 PER BOX FROM INVENTORY, SUBJECT TO PRIOR SALE.

ACCEPT/REJECT QUOTE :
```

*FIG. 8*

This interface software is sometimes referred to in SST's district court briefs as a "specialized software interface" or as the "predistributed software."

This Court also briefly discussed this software interface in *Source Search Technologies, LLC v. LendingTree et al.*, 588 F.3d 1063 (Fed. Cir. 2009):

> Lenders affiliated with LendingTree receive specialized software in advance to help create an interface where the data and terms associated with a potential loan can more readily be established before forwarding to the user. <u>The ′328 patent describes a similar process</u>. *See* ′328 patent col. 6 ll. 46–52 ("Any operating system may be resident on the computer. Programming for the buyer's and vendor's computer type equipment would be appropriate to the variety of goods and services buyers and vendors wish to sell over the network and would change as new goods and services come into existence and old ones are discontinued.")

*Id.* at 1074 (emphasis added).

In the present case, the district court's claim construction opinion also discussed the need for this software interface and, based thereon, construed the claimed step of obtaining quotes to require "the system acquiring the required and available quote information from the vendor's product database using pre-distributed software." (Appx1383-1384).

In any event, it is a small piece of code, which is customized in advance with respect to each vendor's product or service database structure and format, and with respect to what material terms go with each product offered by that vendor. Typically it can be written using what was a conventional database query system at the time of the '328 invention. (Appx165).

It was SST's discussion of this software interface in SST's Opposition ("*Alice* Opposition") to KAYAK'S Motion for Summary Judgment Under §101 ("*Alice* Motion") that forms the sole basis for the exceptional case finding by the district court.

## B. **Procedural History**

### 1) **Proceedings Prior to the Fee Opinion**

The '328 patent in suit here was first asserted in *Source Search Technologies, LLC v. LendingTree et al.*, Civ. No. 04-4420-DRD, 2008 WL 5638262 (D. N.J. July 8, 2008) (Appx1542-1566). In that case, over objections from LendingTree, the court adopted SST's claim construction for the term quote – "the price and other terms of a transaction in sufficient detail to constitute an offer capable of acceptance." *Source Search Technologies, LLC v. LendingTree LLC,* Civ. No. 04-4420-DRD, 2006 WL 2990363 (D.N.J. October 16, 2006)(Appx1531).

After extensive discovery, the parties to that case filed numerous summary judgment motions and cross motions, and the district court found the patent

infringed, but invalid as obvious. *Source Search Technologies, LLC v. LendingTree LLC*, Civ. No. 04-4420-DRD, 2008 WL 5638262 (D. N.J. July 8, 2008)(Appx1542-1566). On appeal, this Court vacated the holding of invalidity, finding that the district court had erred in ruling on summary judgment that the prior art "quotes" were the full '328 patent quotes as that term had been defined. *Source Search Technologies, LLC v. LendingTree LLC*, 588 F.3d 1063, 1071–73 (Fed. Cir. 2009).[2]

The present case was filed in June of 2011, and shortly thereafter, KAYAK filed a reexamination request with the Patent Office. The parties stipulated to stay this litigation while that reexamination proceeded. Sixteen original claims were at issue in the reexamination. Three were cancelled, and the Patent Office affirmed the patentability of all remaining claims without substantive change from their original form. (Appx84-85). Twelve new claims were also added. *Id.*[3]

The litigation was re-started after the reexamination. After some discovery, KAYAK filed for summary judgment by the court ordered deadline of February 12, 2014 (Appx89, ¶11). At that time, only claims 12 and 20 remained at issue.

---

[2] This Court also vacated and affirmed on various other issues, but those are not believed relevant to the present appeal.

[3] There were some minor amendments made to the claims, however, the district court here ruled that such amendments did not change the substantive scope of the claims. (Appx1396-1400).

KAYAK requested summary judgment on six different issues: laches, intervening rights, noninfringement on two different grounds, invalidity due to anticipation, and invalidity due to obviousness. (Appx1388-1428). KAYAK did not file a motion asserting the claims at issue were invalid under 35 U.S.C. §101. *Id.*

On June 16, 2014, the district court issued a decision denying entirely KAYAK's summary judgment motions directed to five of the six grounds. (Appx1388-1415). The sixth – which asserted that the KAYAK system did not return quotes as that term had been construed – was denied in part, granted in part, and referred to a Special Master ("Master"). (Appx1408-1415). On March 10, 2015, the Master issued a recommendation finding approximately twenty percent of KAYAK's activities potentially infringing, and both parties filed objections to that recommendation with the district court in April of 2015. (Appx66, D.I. 257, D.I. 259-63).

Meanwhile, also in June of 2014, four months after the court ordered summary judgment deadline in this case had passed, and a few days after the district court issued its decision with respect to KAYAK's six summary judgment motions, the United States Supreme Court decided *Alice*. Three months later, in September of 2014, KAYAK submitted a letter (Appx1416-1417) requesting permission to file a new motion for summary judgment, out of time, based upon

*Alice*. The district court granted such permission, and ultimately granted KAYAK's *Alice* Motion on July 1, 2015. (Appx1494-1523).

**2) <u>KAYAK'S Attorneys' Fees Motion</u>**

After its *Alice* Motion was granted, KAYAK filed a motion to declare the case exceptional and for attorneys' fees, based upon two grounds. The first ground was that SST's assertion in this case that the KAYAK system returned quotes, as that term had been construed, was baseless. This ground was correctly rejected by the district court, as KAYAK's motion for attorneys' fees presented substantially the same arguments as KAYAK's unsuccessful summary judgment motion for noninfringement on the same issue. (Appx10-13).

As a second ground for attorneys' fees, KAYAK asserted that SST had repeatedly changed its position in characterizing the "pre-distributed software interface," and that such repeated changed positions justified a declaration that the case was exceptional and an award of attorneys' fees. (Appx13-18).

In considering this second argument, the district court found what it called a "subtle" inconsistency between a footnote in the file history of the '328 patent, and SST's position in the *Markman* proceedings. (Appx18). Specifically, in distinguishing certain prior art, the patent office footnote indicated that to modify the prior art systems at the time of the invention so they could pull the terms of a full quote from a vendor database was no small task because it would have

required setting up and writing software to implement specific interfaces between the central computer and the vendor computers to pull all contractually material terms. (Appx1058, fn.4). Ecommerce was in its infancy at the time of the ‘328 invention, and none of the cited prior art showed use of such an interface in an ecommerce system in order to pull all contractually material terms from a vendor database.

During *Markman* proceedings, in response to an assertion that a particular means plus function limitation in claim 4 was not supported with sufficient structure by the specification, SST had offered the declaration of Dr. Pancha, which states, in relevant part:

> Specifically, at col. 5 of the '328 patent, the disclosure indicates that the system interrogates the vendor product database and cross references into the inventory to retrieve pricing and other information necessary to generate the quote. Further, figure 7 of the '328 patent shows a data structure of a record that is to be populated with the terms of the quote, and figure 8 shows an example quote [with all material terms].
>
> I also note that software to perform a database query and pull specified items was well known and in wide use for many years before the 1996 filing date of the '328 patent- indeed, database query systems go back decades before that, and anyone with a basic software background would have known so at the time.
>
> Given this disclosure of the '328 patent, as well as the remaining discussion in the entire patent about generating the quote, it is my opinion that one of ordinary skill in the art would readily recognize at least this as the quote generating means, and that it would be a very simple matter to write a small piece of code to pull the terms desired from the vendor database, assemble them into a data structure and

form a quote from it.

(emphasis added, Appx164-166).

After finding the above *Markman* position and patent office footnote "subtl[y]" inconsistent, the district court noted that because SST's *Alice* Opposition included the patent office footnote in string citations, SST's *Alice* Opposition presented a position that was also subtly inconsistent with SST's *Markman* position. (Appx19-20). This led the Court to conclude that SST had changed positions between the patent office and the *Markman* proceedings, and then later, flipped back again to the position taken in the patent office by citing the patent office footnote in the *Alice* Opposition. *Id.*

The exceptional case finding was then based only upon the second alleged change in position – that between SST's *Markman* position and the *Alice* Opposition. (Appx20)("This was the unreasonable conduct engaged in by SST – changing positions again in order to try and save the validity of the patent.")(emphasis added).[4]

---

[4] The Honorable Faith Hochberg initially presided over this case, but retired from the bench shortly after issuing opinions in the *Markman* proceedings and KAYAK's first six summary judgment motions. The Honorable Joseph Irenas was then assigned to the case, and issued the opinion granting KAYAK's later filed *Alice* Motion. Sadly, Judge Irenas unexpectedly passed away shortly thereafter, and Judge Hillman took over this case after all substantive proceedings were done and all that remained was the attorneys' fees motion. Thus, the *Markman*

The district court summarized its view of the proceedings as follows:

> SST…argued [during *Markman* briefing] for a claim construction based on the fact that a person of ordinary skill in the art would have been able to use the software that existed for decades prior to the '328 patent to make a database query [i.e.; the Pancha testimony], and [in its *Alice* Opposition] argued for patent eligible subject matter based on the inventive concept of a specialized software to make the database query….If SST had…maintained consistency between its *Markman* briefing and *Alice* briefing, no argument could have been sustained regarding an inventive concept to save the patent from being directed toward an abstract idea." (Appx19-20)(emphasis added).

In short, the district court found that SST's *Alice* Opposition, by characterizing the interface software as specialized and by citing the patent office footnote, contradicted SST's *Markman* position that the interface software could be written using well known database query systems. According to the district court, without such a direct contradiction, SST could have made "no argument" in support of patentability in its *Alice* Opposition, and thus should have simply dismissed the case without filing any opposition. (Appx19-20).

As a result of SST not dismissing the case immediately upon the filing of KAYAK's *Alice* motion, the district court declared the case exceptional and awarded nearly $600,000 in attorneys' fees.

---

proceedings, the *Alice* Motion, and the Fee Opinion were presided over by three different judges.

## V. SUMMARY OF ARGUMENT

The exceptional case finding is not supported by the record, and must be reversed, for three reasons:

First, SST simply never argued for patent eligible subject matter in any manner contrary to its *Markman* position. Instead, SST presented two separate arguments for patentability in its *Alice* Opposition, and neither of those two arguments depended even remotely upon any position contrary to SST's *Markman* position. Ironically, SST's *Markman* position is specifically addressed in SST's *Alice* Opposition, but the latter reaffirms, rather than contradicts, the former. The district court's contrary finding is unsupportable, and directly contradicts the record.

Second, the district court misunderstood SST's use of the term "specialized." "Specialized" means that the software interface has to be specifically customized for each vendor database format and structure and for each product, so that the proper material terms of an offer can be retrieved from each vendor's own, unique database in order to assemble a full quote.

The *Markman* briefing, while asserting that one of skill in the art could write that software interface by using known, available database query systems, also refers throughout to that very same software so written as the "specialized" software interface. Similarly, SST's *Alice* Opposition, while calling the software

"specialized," also acknowledges that it could have been written by one of ordinary skill art using known database query systems at the time of the '328 invention. Both statements about that software interface are true (it is specialized, and it could be written by those of skill in the art using known, available database query systems), so both statements were made in *Markman* briefing and both were made in the *Alice* Opposition.

Third, SST's citation to the patent office footnote in the *Alice* Opposition cannot support the exceptional case finding. The footnote was offered for an entirely different reason not addressed by the district court. Indeed, each statement in the *Alice* Opposition for which the footnote was offered is fully accurate, and is supported by many other parallel citations, all of which support the same unrelated (and undisputed) issue not addressed by the district court.

## VI. ARGUMENT

The exceptional case finding is subject to an abuse of discretion standard of review, which is met if the district court commits a clear error of judgment in weighing the relevant facts, or exercises its discretion based upon an error of law or clearly erroneous factual findings. *AntiCancer, Inc. v. Pfizer, Inc.*, 769 F.3d 1323, 1328 (Fed. Cir. 2014)(reversing conditional sanction as abuse of discretion); *Robert Bosch, LLC v. Pylon Manufacturing Corp.*, 659 F.3d 1142 (Fed. Cir. 2011).

Due to the significant impact upon the parties and counsel of an exceptional

case finding, this Court has not hesitated to reverse such findings absent clear and unequivocal misconduct. *Biax Corp. v. Nvidia Corp*., 626 Fed. Appx968 (Fed. Cir. 2015); *Gaymar Industries, Inc. v. Cincinnati Sub-Zero Products, Inc*., 790 F.3d 1369, 1375 (Fed. Cir. 2015).

Here, to affirm the Fee Opinion, this Court would have to find that the district court was within its discretion in holding that SST's *Alice* Opposition was so entirely contradictory to SST's *Markman* position that SST had no right to file its *Alice* Opposition.

### A. SST's *Alice* Opposition Did Not Contradict the *Markman* Position But Instead Reaffirmed The *Markman* Position

In the *Alice* briefing, the parties agreed that the claims were directed to an abstract idea of "obtaining quotes from selected vendors," and the only issue was whether the second step of the *Alice* test was met. (Appx1467).

SST presented two independent grounds in support of its position that the '328 patent defined patentable subject matter: (1) a lack of preemption argument; and (2) a *DDR Holdin*gs[5] argument, which argued that the architecture claimed in the '328 patent solved two computer-centric problems that do not arise in the brick and mortar world, and thus passed the second step of *Alice*. Whether these

[5] *DDR Holdings, LLC v. Hotels.com, L.P.,* 773 F.3d 1245 (Fed. Cir. 2014).

arguments were right or wrong, neither argument had anything to do with SST's *Markman* position.[6]

With regard to its lack of preemption argument, SST devoted two full sections in its *Alice* Opposition to that argument. One section contains an extensive discussion of the preemption case law, along with citations to, and quotes from, a significant number of pre- and post- *Alice* decisions concerning the issue. The ensuing section then argues that the '328 claims are only directed to one of many computerized implementations of "obtaining quotes from selected vendors," and thus, did not preempt the abstract idea itself. This section is supported by expert testimony establishing that there were a significant number of noninfringing ways in which the agreed upon abstract idea – obtaining quotes from selected vendors – could be implemented on computer systems, and thus, that there was no preemption. (Appx1472-1480).

SST also argued in the preemption section that the '328 patent cannot be merely an abstract idea with instructions to apply it to a general purpose computer, because the '328 patent: 1) explicitly states that the prior art had already implemented the parties' agreed upon abstract idea – "obtaining quotes from selected vendors" – on a computer system, 2) that there were technical problems

[6] The Fee Opinion correctly notes that KAYAK did not challenge the objective reasonableness of these two arguments, but only whether SST contradicted the *Markman* position. (Appx15).

with that prior art computerized implementation of that abstract idea, and that, 3) the ‘328 patent disclosed a different and specific computerized implementation of that abstract idea. (Appx1479-1480).

Thus, argued SST, the ‘328 patent was directed to only one improved computerized implementation of the parties’ agreed upon abstract idea, not the implementation of that abstract idea on any general purpose computer system – which the ‘328 on its face admits is prior art. (Appx1479-1480, Appx79, col. 1, lines 42-60).

Significant case law was offered to support this argument, much of it including holdings that essentially mirrored SST’s arguments by discussing how the existence of other computerized manners of implementing the abstract idea at issue led to the conclusion that the claim was patentable under *Alice*. (Appx1472-1474).

SST’s second ground for opposing KAYAK’s *Alice* Motion (the *DDR Holdings* argument) was that the claimed architecture, by removing the need to store all the product information at a central database in advance, and by using predistributed software interfaces to the various vendor databases that obtained quote information from the vendor databases in response to each RFQ, solved two computer centric problems that do not arise in the brick and mortar world. Specifically, both the database management problem and the computer interface

problem would be eliminated. (Appx1480-1486). One of these problems is clearly described in the ‘328 patent itself, and both are described repeatedly throughout the patent’s file history. (Appx79, col. 1, Appx1227, Appx1244-1245).

Notably, *DDR Holdings*, at 1237, held that “[U]nder any of these characterizations of the abstract idea, the ‘399 patent’s claims satisfy *Mayo/Alice* step two” by relying heavily if not exclusively upon the following findings (all emphasis added):

> [T]hese claims stand apart because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks. *Id*., at 1257.
>
> In short, the claimed solution amounts to an inventive concept for resolving this particular Internet-centric problem, rendering the claims patent-eligible. *Id*., at 1259.
>
> Although the claims address a business challenge (retaining website visitors), it is a challenge particular to the Internet. *Id*., at 1257.
>
> While that concept may have been well-known by the relevant timeframe, that practice did not have to account for the ephemeral nature of an Internet…which introduces a problem that does not arise in the “brick and mortar” context. *Id*., at 1258.

Relying upon the above, SST's argued that because the '328 claimed architecture solved two problems arising exclusively in the computer world, the claims passed the second step of *Alice*. (Appx1480-1486).[7]

The preemption section is entirely addressed to, and depends entirely upon, showing that the claimed invention is only one of many different ways of computerizing the same agreed upon abstract idea. (Appx1472-1480). The *DDR Holdings* section is directed entirely to a discussion of how, by eliminating the central database and replacing it with interfaces to the individual vendor databases so that quotes are assembled, responsive to each RFQ, from information retrieved from the vendor databases, two technical problems that do not exist in the brick and mortar world are solved. (Appx1480-1486).

Concerning the *Markman* position, there is no mention whatsoever, throughout either one of those arguments in the *Alice* Opposition, of whether one of ordinary skill in the art, after reading the '328 patent, would – or would not – be able to easily write the specialized software interface to each vendor database using then available database query systems. (Appx1472-1486).

---

[7] The prior judge who granted KAYAK's summary judgment motion took a similar view of *DDR Holdings*. ("*DDR Holdings* leaves room for patents that do not merely recite some known business practice if the system or method by which the patent happens to implement that idea also solves a problem specifically arising in the realm of computer technology.")(Appx21).

Further, it would have served SST no purpose to have contradicted its *Markman* position by arguing that the software interface could not be written using available database query systems. *DDR Holdings* involved a claim limitation directed to a computer processer programmed to display data from a second website with the look and feel of a first website. *Id.*, at 1249. Nothing in *DDR Holdings* even remotely suggests that the outcome turned on whether one of ordinary skill in the art, after reading the patent at issue, could write a program to perform one of the claim steps required by using commercially available software systems. Nor do any of the numerous preemption cases cited in SST's *Alice* Opposition – or any preemption cases at all of which SST is aware – turn on whether one of skill in the art, after reading the patent in suit, could write customized code using available software systems to implement one of the several steps of the claim.

Moreover, not only did neither of SST's *Alice* Opposition arguments <u>contradict</u> SST's *Markman* position, but SST's *Alice* Opposition clearly <u>reaffirmed</u> the *Markman* position. Specifically, KAYAK's *Alice* Motion asserted that "SST Admitted That Obtaining Quotes Required Only Conventional—Not Inventive—Technology." (Appx1455). To support that, KAYAK <u>cited and quoted</u> SST's *Markman* position <u>and</u> the <u>specific portion of the Pancha declaration</u> at issue in the Fee Opinion, and argued that, based upon that *Markman* position, "SST

acknowledged that any software engineer would know how to create [the specialized interface].” (Appx1455-1456).

If SST were attempting to contradict its *Markman* position in the manner in which the district court ruled, it would have responded to this by arguing that KAYAK was incorrect to call this software “Conventional – Not Inventive,” and that this specialized software was the novel, inventive step that imparted patentability under the second step of *Alice*. At the very least, SST would have cited the patent office footnote here, in support of its position that the software was the inventive step. Indeed, the exceptional case finding, and the entire Fee Opinion, is premised exclusively upon the notion that it was this very KAYAK argument – that the interface software could be written with conventional database query systems – that the patent office footnote was improperly used by SST to rebut. (Appx17 (“When it came to briefing the issue of patent eligible subject matter…SST pointed to the footnote…”)).

Instead however, SST’s *Alice* Opposition specifically cited and addressed KAYAK’S argument in this regard, <u>reaffirmed</u> the *Markman* position, and made a legal argument that the *Markman* position did not preclude patentability under *Alice*:

> KAYAK cites: (1) SST’s previously excluded expert *Markman* declaration (Pancha Declaration, D.I. 84–1), which opined that claim 4 was enabled because “[S]oftware to perform a database query and pull specified items was well known…” [However]Dr. Pancha opined that

> given the fact that software "to perform a database query and pull specified items from a database" was known, one of skill in the art could read the '328 patent, and based on that description use the database query technology to implement what was disclosed for the first time in the '328 patent. (D.I. 84–1). That does not mean that what was disclosed in the '328 patent to begin with was known at the time. KAYAK has pointed to no prior art that shows the subject claim feature.
>
> (Appx1489-1490)(emphasis added).[8]

SST never contradicted its *Markman* position, or cited the footnote at this portion of its *Alice* Opposition, nor did SST argue that the software could not be easily written using known, available database query systems. Instead, SST argued that the *Markman* position, while correct, did not mandate the result being advocated by KAYAK because the prior art did not show the use of such an interface.

In summary, the exceptional case finding is based upon the view that "If SST had…maintained a consistency between its *Markman* briefing and *Alice* briefing" it could not have made any argument at all in its *Alice* Opposition, and thus, SST should not have filed its *Alice* Opposition. Yet, neither argument presented in SST's *Alice* Opposition in any way argues, or even remotely implies, that the software interface disclosed in the '328 patent could not be easily written using known, available, database query systems – as SST had stated during

---

[8] SST also put forth a second legal argument on this issue, and this second argument also did not dispute or vary from the *Markman* position. (Appx1489-90).

*Markman* proceedings. Neither argument in the *Alice* Opposition is in any way inconsistent with the *Markman* position, much less so directly contradictory to that *Markman* position that it would support an exceptional case finding and an award of nearly $600,000 in attorney fees.

The district court committed error and must be reversed.

### (1) **The District Court Reaffirmed the Error In Its Reconsideration Opinion**

After the district court issued the Fee Opinion, SST moved for reconsideration by pointing out that its *Alice* Opposition did not contradict the *Markman* position. However, the court denied reconsideration, not commenting substantively upon the preemption argument, and again ruling that the *DDR Holdings* argument required contradicting the *Markman* position:

> For SST to now submit that its *Alice* briefing argued that the ’328 Patent was survived *Alice* step two only because it solved a computer centric problem is indeed a frivolous argument based on the plain reading of *DDR Holdings*. The ’328 Patent still needed to demonstrate an inventive concept, and the inventive concept is what SST effectively abandoned in its *Markman* position, as explained by this Court in the Fee Opinion.

(Appx54-55)(emphasis added).

The court appears to have concluded that since, in its view, SST’s *DDR Holdings* argument required SST to assert that the specialized software interface could not be written using known database systems, SST must have made such an

assertion in the *Alice* Opposition, and could not have done so without contradicting the *Markman* position.

SST however, never made such an assertion.  SST's *DDR Holdings* argument was that the second step of the *Alice* test was met because changing ecommerce systems from an architecture in which data was uploaded in advance into whatever single database structure the central computer used, as shown here:



to **<u>this</u>** architecture…




in which quotes are obtained responsively to each RFQ by filtering the RFQs and installing software interfaces <u>customized to each particular vendor database</u>, its contractually material terms, etc., was an inventive concept that solved two problems rooted exclusively in computer technology. These two problems, a database management problem and a computer interface problem, do not exist in the brick and mortar world. (Appx1480-1486).

<u>SST did not need to</u> **<u>– but more importantly, never attempted to –</u>** <u>demonstrate that any particular single step of claims 12 or 20, much less the specialized software interface, could not be implemented using available technology, in order to demonstrate an inventive concept</u>. Indeed, the very *DDR Holdings* language cited in the reconsideration opinion indicates the "second step [of *Alice*] is the search for an 'inventive concept,' or some element <u>or combination</u>

of elements [sufficient to demonstrate an inventive concept]" (Appx54)(emphasis added).

In fact, this focus on whether a single step of the claim is itself patentable, is precisely what this Court reversed as legal error in *Bascom Global Internet v. AT&T Mobility LLC*, 827 F.3d 1341(Fed. Cir. 2016). Specifically, in *Bascom*, this Court found that the claim recited an abstract idea, and that every one of the claim limitations recited "generic computer, network and Internet components, none of which is inventive by itself." *Id*., at 1349. (emphasis added). Nonetheless the Court reversed the district court, found the case analogous to *DDR Holdings*, and ruled that the claim passed the second step of *Alice*:

> The inventive concept described and claimed in the '606 patent is the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering feature specific to each end user.

*Id*., at 1350. (emphasis added).

Similarly, the inventive concept argued by SST in the *Alice* Opposition was to replace the central database system of the prior art with the installation of a small pre-distributed software agent, dropped between the central computer and each the individual vendor computer databases. This software would be arranged in advance to account for the varying formats, structures, and database types used by each vendor to store commercial terms of a sale, as well as the significantly varying commercially material terms associated with different products and

services, and would avoid two different technical problems articulated directly in the patent file itself. (Appx1480-1486). The ‘328 even describes how this software would have to change to account for different products being sold. (Appx81, col. 6, lines 46–51).

The fact that such an interface could have been written using known database query systems was simply irrelevant. Neither *Bascom* nor *DDR Holdings* indicates that any one of the claimed steps cannot be easily implemented by those of skill in the art using known technology, and *Bascom* affirmatively indicates to the contrary. [9]

Moreover, the issue here is not whether the ‘328 claims pass *Alice* pursuant to the reasoning of *DDR Holdings* or *Bascom*, or whether SST’s argument was correct on the merits. The issue here is not even whether SST’s argument was reasonably supported by that case law: The Fee Opinion itself notes that KAYAK was not even arguing, and the court did not rule, that SST argued something that was frivolous in light of applicable case law. (Appx15, Appx20).

[9] A second prior art reference, FAST, represented a primitive attempt to pull quotes from the vendor databases. However, in the prior appeal to this Court, SST pointed out that FAST did not contain the required interface to the vendor databases, and thus, could not obtain the price and other terms of a transaction in sufficient detail to constitute an offer capable of acceptance. As a result, this Court previously vacated as erroneous the district court’s previous summary judgment ruling that FAST returned ‘328 type quotes. *Source Search Technologies, LLC*, at 1071-72. SST’s assertion here concerning the second step of *Alice* was essentially the same claim limitation that this Court previously ruled saved the validity of the ‘328 patent.

The question here is whether, in view of those cases and the *Markman* position that the interface software could be written using known database query systems, the *Alice* Opposition was so directly contradictory to that *Markman* position that SST had no right to file it and instead should have conceded the invalidity of its patent. Any reasonable reading of SST's *Alice* Opposition reveals this question must be answered in the negative.

Simply put, SST's *Alice* Opposition is clear on its face – it contains nothing contradicting the *Markman* position and nothing arguing that the specialized software interface could not be written using known, available database query systems. It also reaffirms the *Markman* position.

The district court's exceptional case finding is thus unsupportable. *Biax Corp. v. Nvidia Corp.*, 626 Fed. Appx968 (Fed. Cir. 2015); *Gaymar Industries, Inc. v. Cincinnati Sub-Zero Products, Inc.*, 790 F.3d 1369 (Fed. Cir. 2015) (reversing award of attorneys' fees because statements made during litigation could be read to not contradict each other.).

### B. The District Court Misunderstood SST's Use of "Specialized"

SST believes the district court may have misunderstood SST's use of the term "specialized" in the *Alice* Opposition. The court summarized the purported inconsistency as follows:

> In summary, SST…argued [during *Markman* briefing] for a claim construction based on the fact that a person of ordinary skill in the art

> would have been able to use the software that existed for decades prior to the '328 patent to make a database query, and [in its *Alice* Opposition] argued for patent eligible subject matter based on the inventive concept of a specialized software to make the database query.

(Appx19).

The court appears to have concluded there was a contradiction because software that existed for decades is not specialized. This was error.

First, what SST actually asserted during *Markman* was that "[S]oftware to perform a database query and pull specified items" existed for decades when the '328 patent was filed, and that therefore:

> "Given this disclosure of the '328 patent, as well as the remaining discussion in the entire patent about generating the quote, it is my opinion that one of ordinary skill in the art would [find it] a very simple matter to write a small piece of code to pull the terms desired from the vendor database, assemble them into a data structure, and form a quote from it."

(Appx165)(emphasis added).

"Specialized" means "designed for a particular purpose." http://www.oxforddictionaries.com/us/definition/american_english/specialized. Describing the software as specialized does not contradict the assertion that it could be written using conventional database query systems for pulling data from a database. The software still had to be custom designed and written, because prior art ecommerce was in its infancy at the time, and ecommerce systems did not include the use of a small predistributed software interface, disposed between the

central computer and each vendor computer, customized for the vendor database to account for the varying vendor database structures, formats, products, and contractually material terms that go with each offer capable of acceptance so that a full quote could be returned.

Lest there be any doubt that this is how SST's briefing was using the term "specialized," the same software interface that SST's *Markman* briefing asserts could be easily written using then available database query systems is referred to throughout that very same *Markman* briefing as the specialized software interface.[10] Conversely, the *Alice* Opposition that refers to the software as specialized also acknowledges, as Dr. Pancha opined, that one of skill in the art

---

[10] *See* SST *Markman* Brief (Appx100)(some emphasis added):

> An important aspect of the '328 invention is the special interface, labeled above, between the central computer and the vendor associated computers that contain information for one or more vendors. Specifically, because numerous detailed terms of a quote must be retrieved by the central computer, in response to the RFQ, from the vendor associated computer, there must be some predetermined protocol and data structure agreed upon in advance as to what terms upon which a vendor will do business, where and in what format the product /service details will be stored at the vendor computer, and how the central computer will access them. Otherwise, how would the central computer know where to find, in all the different vendor databases, the return policy, the shipping terms, the shipping times, etc., or even if those items were stored there at all?

See also, *Markman* Responsive Brief. (Appx142("the specialized software for quote generation"), Appx144( "SST was arguing [generation of the quote] required the specialized software.))(emphasis added).

could easily write that same specialized software, using known database query systems, after reading the '328 patent.[11]

SST argued consistently, both in the *Markman* position and in the *Alice* Opposition, that the use of the specialized interface between the central computer and the vendor computer, customized for the specific format, structure, and available material terms of each different vendor database and each product, so that all the material terms of a full contractual offer could be compiled, responsive to the RFQs, was novel when compared with prior art centralized database systems. SST never argued during *Alice* briefing that such an interface could not be written easily by one of skill in the art, using known database query systems.

In short, the district court erred in holding that the term "specialized" in the *Alice* Opposition was inconsistent with SST's *Markman* position that the disclosed interface could be written using known database query systems. Both statements are used in both briefs to describe the same software because <u>both</u> statements about this software interface are fully accurate.

---

[11] *See* SST *Alice* Opposition (Appx1490):

> Dr. Pancha opined that given the fact that software 'to perform a database query and pull specified items from a database' was known, one of skill in the art could read the '328 patent, and based on that description use the database query technology to implement what was disclosed for the first time in the '328 patent…That does not mean that what was disclosed in the '328 patent to begin with was known at the time.

### C. SST's Citation of the Patent Office Footnote Does Not Support the Exceptional Case Finding

Finally, the district court also pointed to four places in the *Alice* Opposition where SST cited the footnote from the patent office submission. (Appx17). While SST does not believe the patent office footnote is inconsistent with any position it took in litigation, that issue is somewhat academic because the exceptional case finding was based only upon the use of that patent office footnote in the *Alice* Opposition. (Appx20). We therefore limit the analysis here accordingly.[12]

The *Alice* Opposition's citation to that footnote cannot support an exceptional case finding for two reasons.

First, here are the four statements in the *Alice* Opposition citing the footnote:

> Without [the software interface], the varying vendor database types and formats would make it difficult to find the return policy, the shipping

[12] At issue in the patent office proceedings was a prior art rejection, and the relatively large extent to which the prior art would have to be modified to arrive at the claimed invention. There was no issue as to whether one of skill in the art, after reading the '328 patent, could implement the software interface, or any other part of the claimed invention, using then available technology. At issue in the *Markman* proceedings was whether the '328 patent specification sufficiently disclosed certain means plus function claim limitations. In any event, as is typical in nearly all *Markman* decisions involving use of the patent file history to construe claims, the prior judge that issued the *Markman* decision rejected several of the claim constructions offered by each of KAYAK and SST as not fully consistent with the patent file. (Appx1364-1365, rejecting several claim construction arguments offered by KAYAK as inconsistent with the file history.) To whatever extent either party's *Markman* briefing was found to vary from the patent office proceedings, it was accounted for in the *Markman* decision and did not form the basis of any exceptional case finding.

> terms, the shipping times, etc., in each vendor database. (JA12, col. 4, lines 37-43; JA13, col. 5, lines 36-49; JA1299; JA1478 at fn.4; JA1665 (Noting database structures and formats vary among vendors, and a predistributed software interface is a way to overcome this problem).
>
> Each of the claims at issue here requires "the system acquiring the required and available quote information from the vendor's product database using pre-distributed software." (*Markman* Opinion, D.I. 131; JA12, col. 4, lines 37-43; JA13, col. 5, lines 36-49; JA1299; JA1478 at fn. 4 (explaining the requirement for the specialized predefined software interface to solve the database compatibility problem of the prior art.); JA1665 (noting that database structures and formats vary among vendors, and a predistributed software interface is needed.)
>
> Not surprisingly none of KAYAK's cases involve a patent file history like that here, which acknowledges: (1) obtaining quotes from selected vendors (the alleged abstract method) over a computer network is known (JA80-81); (2) that such systems present certain technology problems with database management (JA149-150)[due to the use of the central database system], and (3) that by distributing the database management among multiple vendors, and using predistributed interface software to overcome the interface problem, this known technical problem is solved (JA149-150; 1299; 1478 at fn.4; 1665).
>
> This problem, and the '328 patent's solution to it, is emphasized repeatedly throughout the '328 patent and its file history. (*e.g.* JA1478 at fn. 4; JA1665 (noting database structures and formats vary and a predistributed software interface is a way to overcome this problem.)

(Appx1471, Appx1475, Appx1479, Appx1484, respectively).

None of the four statements even imply – much less affirmatively argue – that the software interface to each vendor database could not be easily written by one of ordinary skill in the art, using available database query systems, after reading the '328 patent's instruction to do so.

Further, all four statements are supported by, in addition to the patent office footnote, one or more of the following additional citations: (1) col. 4, lines 37–43 and cols 5, lines 36-49 of the '328 patent (Appx80-81); (2) JA1299 (Appx879); (3) JA149-50 (Appx286-287); (4) JA1665 (Appx1245); and (5) the *Markman* Opinion. (Appx1354-1387). These additional citations are indisputably and independently supportive of the same statement for which the footnote is offered, and there was not even an assertion to the contrary in this litigation. Nor was there an assertion, much less a finding by the court, that any of these additional citations are inconsistent with SST's *Markman* position.

Thus, the exact same *Alice* Opposition could have been filed, with all the same substantive arguments, without even citing that footnote.[13]

Second, the district court apparently believed that SST was citing this patent office footnote in its *Alice* Opposition in support of an argument that the novelty and inventiveness of this "specialized" software was the inventive concept that

---

[13] The first additional citation is to two passages in the '328 patent that speak of using "suitable software" or "quotation supplied system software" to link with and access vendor databases. (Appx80-81). The second notes the prearranged software is needed to pull the terms of a quote, and explains why. (Appx879). The third doesn't even discuss the interface software, but merely asserts that the invention differs over the prior art by eliminating the central database. (Appx286-287). The fourth cites to a portion of the file history that states the pre-arranged software is needed. (Appx1245). The final cite is to the court's *Markman* Opinion in this case. None of those cites, nor the statements in the *Alice* Opposition for which they were cited, argue, assert, or even imply that the specialized software interface could not be written using known database management systems.

passed the second step of *Alice*. Not only do the underlying arguments for which the footnote was cited, as well as the remainder of the entire *Alice* Opposition, reflect otherwise, but this would have required a rather remarkable legal strategy on the part of SST:

1) Present an *Alice* Opposition with two arguments, one based upon *DDR Holdings* and the other upon a theory of preemption, neither of which mentions anything about the interface software being novel or difficult to write or inventive;

2) Omit any argument subsection in the *Alice* Opposition arguing that the interface software is inventive;

3) Specifically cite KAYAK's assertions that the interface software used conventional, not inventive, technology, and dispute neither;

4) Scatter four statements throughout the *Alice* Opposition that cite to plural portions of the record, none of which argue that the interface software is novel or inventive;

5) Ensure that one of the cites of the plural cites supporting each of the four statements was to a patent office footnote containing the one argument without which SST could not even oppose KAYAK's *Alice* motion; and

6) Trust that the court would search the record and find SST's sole winning argument in a patent office footnote in an office action response, rather than in SST's brief.

With the utmost respect due the district court, this conclusion is patently unreasonable, and a review of SST's *Alice* Opposition makes clear that this is not the conduct in which SST was engaging. In actuality, all four statements for which the footnote was cited relate to the need for the interface software and the problem

of central database systems in the prior art, just as explained in the '328 patent itself, and throughout the patent file history.

The footnote was cited along with one or more other exemplary places in the record that discussed this issue. It could have been simply omitted, and the same statements supported by the remaining record citations. Including the patent office footnote in a string citation in the *Alice* Opposition cannot support the exceptional case finding.

### D. No Other Conduct Supports an Exceptional Case Finding

Finally, it bears emphasizing that the exceptional case finding in this litigation is not premised upon SST's litigation conduct in general, or the filing of a baseless infringement suit. To the contrary, by the time KAYAK filed its *Alice* motion, the '328 patent had survived: (1) two prior extensive litigations in which large, nationally renowned law firms represented large, well-funded defendants, both of which took licenses under the '328 patent; (2) a prior appeal to this Court, resulting in a precedential opinion, which vacated the lower court's summary judgment of invalidity in response to SST's argument that the same interface software was not clearly present in the prior art, and thus, there were factual issues about whether such prior art could return a full quote; (3) a multiyear reexamination proceeding, initiated by KAYAK, before the U.S. Patent and Trademark Office, and (3) multiple summary judgment motions in this litigation,

directed to six different issues, including multiple noninfringement and multiple invalidity grounds. Absent the Supreme Court deciding *Alice* in 2014, this case would have been headed for trial after all KAYAK's motions – none of which claimed the '328 patent was directed to non-statutory subject matter - were adjudicated.

*Alice* created a significant amount of uncertainty concerning software patents, as emphasized by: (1) KAYAK's own representation to the district court that it had to "monitor application of [the *Alice* decision]" for several months before it could determine whether it should proceed with its *Alice Motion* here (Appx1424-1425); (2) This Court's *DDR Holdings* decision containing a dissent; and (3) post-*Alice* cases denying similar attorneys' fees motions, and noting the unsettled and rapidly evolving state of the law following *Alice*. *Clarilogic Corp. v. Formfree Holdings, Inc.*, 15-cv-41, slip op. (S.D. Cal. April 27, 2016)(Appx1581-1585); *Credit Acceptance Corp. v. Westlake Services*, LLC, 13-cv-1523, slip. op. (C.D. Cal. Nov. 2, 2015)(Appx1567-1580).

In the immediate aftermath of *Alice*, and prior to a significant amount of case law interpreting *Alice* issuing, SST argued that the claims: (1) did not preempt the idea entirely, but only covered a specific improved computerized manner of implementing the idea, and (2) changed the architecture of ecommerce

systems to solve both a database management and a computer interface problem, neither of which existed in the brick and mortar world.

SST presented factual and legal support for each, and the merits of these arguments were not a ground the exceptional case holding, nor did KAYAK even argue these arguments, on the merits, supported an exceptional case finding. The dispositive issue here is that neither *Alice* Opposition argument depended in any way upon SST arguing that the specialized software interface could not be easily written using known database query systems. Such an assertion appears nowhere in SST's *Alice* Opposition.

SST respectfully submits that this record cannot justify a finding that the case was exceptional.

## VII. CONCLUSION

This Court should reverse the district court's order that this case was exceptional, and should reverse the resulting award of attorneys' fees.

Respectfully submitted,

/s/ Jeffrey I. Kaplan

Jeffrey I. Kaplan, Esq.
KAPLAN BREYER SCHWARZ
& OTTESEN, LLP
100 Matawan Road Suite 120
Matawan, New Jersey 07747
Telephone: (732) 578-0103
Facsimile: (732) 578-0104

Email: jkaplan@kbsolaw.com

DATED: January 6, 2017

# ADDENDUM

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SOURCE SEARCH TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>KAYAK SOFTWARE CORPORATION,<br><br>Defendant. | Civil No. 11-3388(NLH/KMW)<br><br>**OPINION** |

**APPEARANCES:**

KAPLAN BREYER SCHWARZ & OTTESEN, LLP
By: Jeffrey I. Kaplan, Esq.
Daniel Basov, Esq. (pro hac vice)
100 Matawan Road
Matawan, New Jersey 07747
Counsel for Plaintiff Source Search Technologies, LLC

K&L GATES LLP
By: Rosemary Alito, Esq.
C. Bryan Cantrell, Esq.
One Newark Center, Tenth Floor
Newark, New Jersey 07102

By: John J. Cotter, Esq. (pro hac vice)
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111
Counsel for Defendant KAYAK Software Corporation

**HILLMAN**, United States District Judge:

Plaintiff Source Search Technologies, LLC ("Plaintiff" or "SST") brought this action against Defendant KAYAK Software Corporation ("Defendant" or "Kayak") alleging infringement of

U.S. Patent No. 5,758,328 (the "'328 Patent") entitled "Computerized Quotation System and Method."

This matter comes before the Court upon Kayak's Motion for Attorneys' Fees ("Defendant's Motion" [Dkt. No. 284]). Kayak seeks a declaration from this Court this patent case is "exceptional" pursuant to 35 U.S.C. § 285 and requests that this Court grant it attorneys' fees based on the litigation conduct and allegedly meritless arguments put forth by SST. For the reasons that follow, Defendant's Motion will be **GRANTED-IN-PART and DENIED-IN-PART.**

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

The '328 Patent initially issued on May 26, 1998. See '328 Patent at cover. Prior to filing the instant case, SST had asserted the '328 Patent before in this district. SST sued Lending Tree, LLC and others in 2004 in an action before the Honorable Dickinson R. Debevoise. See Source Search Techs., LLC v. Lending Tree, LLC (Lending Tree), 588 F.3d 1063, 1066 (Fed. Cir. 2009). Judge Debevoise held a claim construction hearing and construed certain terms of the '328 Patent, and then on summary judgment found the patent infringed, but invalid as

[1] Additional history of this case was set out in the Court's opinion finding the '328 Patent invalid under 35 U.S.C. § 101. See Source Search Techs., LLC v. Kayak Software Corp. (Invalidity Opinion), 111 F. Supp. 3d 603, 604–606 (D.N.J. 2015).

obvious. Id. at 1068. The parties appealed the decision, and the Federal Circuit reversed the findings of infringement and invalidity on the basis of an existence of a factual dispute. See id. at 1066. The Federal Circuit adopted the district court's implied construction of the term "quote" to mean "price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance." Id. at 1071, 1075. This was the construction offered by SST and for which SST argued in both the district court and on appeal. (See Pl.'s Opp. [Dkt. No. 288] at 3–4.) On remand, the parties settled the action without further decision from the district court. (See Order (Jan. 19, 2010), [Dkt. No. 283 in No. 04-4420 (DRD)].)

The complaint in this case was filed in June 2011, alleging that Kayak infringed the '328 Patent. (See generally Compl. [Dkt. No. 1].) Then, in August 2011 the U.S. Patent and Trademark Office (the "PTO") undertook an ex parte reexamination of the '328 Patent. See '328 Patent Reexamination Certificate at cover. When the '328 Patent underwent reexamination, the case was stayed. (See Order (Oct. 21, 2011) [Dkt. No. 25].) A Reexamination Certificate issued on March 21, 2013, and as a result three claims were cancelled, two claims were held patentable as amended, and twelve claims were added. See '328 Patent Reexamination Certificate at cover, col. 1 ll. 14–24. The case was reopened in 2013, and SST filed an amended

complaint consistent with the reexamination. (See Order (Feb. 25, 2013) [Dkt. No. 40]; Amend. Compl. [Dkt. No. 43].)

The Court[2] issued a claim construction opinion and order construing the disputed claims on January 27, 2014. See Source Search Techs., LLC v. Kayak Software Corp. (Markman Opinion), No. 11-3388 (FSH), 2014 WL 314665 (D.N.J. Jan. 27, 2014). As a result of claim construction, certain claims were held invalid as indefinite. See id. at *9, 11–13, 18. Following claim construction, the Court also denied-in-part and granted-in-part a motion for summary judgment by Kayak on June 16, 2014. Source Search Techs., LLC v. Kayak Software Corp. (Summary Judgment Opinion), No. 11-3388 (FSH), [Dkt. No. 199], (D.N.J. June 16, 2014).[3] The Court found that Kayak could not limit damages due to the reexamination, Summary Judgment Opinion, slip op. at 5–13, but found that Kayak was entitled to partial summary judgment of non-infringement on the grounds that “if the ‘price

---

[2] This case was originally assigned to the Honorable Faith S. Hochberg who authored the Markman Opinion and Summary Judgment Opinion. Upon her retirement from the bench, the case was reassigned to the Honorable Joseph E. Irenas. (See Order (Mar. 9, 2015) [Dkt. No. 258].) Judge Irenas then authored the Invalidity Opinion. Judge Irenas unfortunately passed away during the pendency of this motion, upon which the case was reassigned to the undersigned. (See Order (Oct. 29, 2015) [Dkt. No. 291].)

[3] Although marked “Filed Under Seal”, the Opinion was unsealed on June 26, 2014. (See Order (June 26, 2014) [Dkt. No. 201].) This opinion was not reported, officially or unofficially, in any commercial legal database.

and terms' response from Kayak is insufficient to form a binding contract at that price and upon those terms such that a use cannot simply click 'accept,' or its equivalent, to obtain a binding contract, that search query and response by Kayak does not infringe," id. at 21–26.[4] In order to clarify what portion of Kayak's activity fell within the scope of the noninfringement ruling, the Court referred the issue to a Special Master. Id. at 27. The Special Master issued his Report and Recommendation ("R&R") on March 10, 2015. (See R&R (Mar. 10, 2015) [Dkt. No. 257].) The parties filed objections to the R&R in response. (See SST's Objections [Dkt. No. 259]; Kayak's Objections [Dkt. No. 260].)

A few days after the Court issued its Summary Judgment Opinion, the Supreme Court decided Alice Corp. Pty. Ltd. v. CLS Bank International, 134 S. Ct. 2347 (2014), on the issue of patent eligible subject matter under 35 U.S.C. § 101. During the pendency of the proceedings before the Special Master, Kayak was granted leave to file another motion for summary judgment on the grounds that the '328 Patent is directed toward patent

[4] The Court also found that issues of material fact precluded summary judgment on Kayak's laches defense to limit damages, Summary Judgment Opinion, slip op. at 14–15, on Kayak's anticipation and obviousness arguments, id. at 15–18, and on Kayak's noninfringement argument with respect to "predistributed software," id. at 19–21. Thus, the Court did not rule on the merits on those issues.

ineligible subject matter. Invalidity Opinion, 111 F. Supp. 3d at 606. After briefing and hearing oral argument, the Court ultimately concluded that the ’328 Patent was invalid under 35 U.S.C. § 101 for claiming an abstract idea and terminated the case. Id. at 617. In so concluding, the Court dismissed objections to the Special Master’s report as moot. Id.

Kayak then timely filed the instant motion, as well as a motion for costs [Dkt. No. 283]. On November 13, 2015, the Clerk granted-in-part and denied-in-part the application for costs. (See Clerk’s Order (Nov. 13, 2015) [Dkt. No. 294].) The Clerk taxed costs for the printed transcripts of four court hearings and partially taxed the costs for certain depositions. (Id. at 6–12.) The Clerk declined to tax the costs for videotaping depositions and also declined to tax the costs for the Special Master and costs of legal research. (Id. at 10–16.) Kayak’s motion seeks fees pursuant to both 35 U.S.C. § 285, the fee shifting provision of the Patent Act, and the Court’s inherent ability to sanction under 28 U.S.C. § 1927.

## II. JURISDICTION

This action for patent infringement arises under the patent laws of the United States. Accordingly, this Court exercises subject matter jurisdiction pursuant to 18 U.S.C. § 1331 and § 1338(a).

## III. LEGAL STANDARD

### A. "Exceptional" Case under 35 U.S.C. § 285

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The Supreme Court has recently had the chance to clarify the standard to be applied in these cases, and defining an "exceptional" cases as "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014) (emphasis added). A party need only prove that it is entitled to fees by a preponderance of the evidence. *Id.* at 1758.

Determining whether a case is "exceptional" under 35 U.S.C. § 285 is reserved to the discretion of the district court, and is to be assessed under the totality of the circumstances. *Id.* at 1756; *see also* *Mathis v. Spears*, 857 F.2d 749, 755 (Fed. Cir. 1988) ("The methodology of assessing a reasonable award under 35 U.S.C. § 285 is within the discretion of the district court.") (citation omitted). The circumstances the court should consider "include[e] 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of

the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" Octane Fitness, 134 S. Ct. at 1756 n.6 (citing Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 n.19 (1994)).

### B. Sanctionable Conduct under 28 U.S.C. § 1927

While determination of a case as "exceptional" under 35 U.S.C. § 285 is an issue of Federal Circuit law, the determination of sanctions under 28 U.S.C. § 1927 is an issue of regional circuit law. See Oplus Techs., Ltd. v. Vizio, Inc., 782 F.3d 1371, 1374 (Fed. Cir. 2015). Sanctions under this statute "'are intended to deter an attorney from intentionally and unnecessarily delaying judicial proceedings, and they are limited to the costs that result from such delay.'" In re Prosser, 777 F.3d 154, 161 (3d Cir. 2015) (quoting LaSalle Nat'l Bank v. First Conn. Holding Grp., LLC, 287 F.3d 279, 288 (3d Cir. 2002)).

## IV. DISCUSSION

Kayak seeks a declaration that the case is "exceptional" under 35 U.S.C. § 285 or sanctionable under 28 U.S.C. § 1927 on two different grounds: (1) SST contradicted previous arguments made in the prior case with respect to the meaning of "quote" in arguing for infringement here (Def.'s Mot. Br. at 7–12); and (2) SST contradicted previous arguments made to the PTO in

reexamination with respect to the meaning of "software" in arguing for its proffered construction and for patent eligibility (id. at 12–13.). Kayak seeks attorneys' fees as well as expert fees and Special Master's fees as a result of SST's litigation conduct. (Id. at 13–14.)[5] SST responds that it never changed position on the meaning of "quote" (Pl.'s Opp. at 11–19), and that the arguments with respect to "software" are meritless (id. at 26). SST further affirmatively argues that the finding of the patents invalidity under 35 U.S.C. § 101 in the wake of the Alice decision cannot be the basis for awarding attorneys' fees back to the beginning of the litigation (id. at 19–22), and that any allegations of misconduct in front of the Special Master or with respect to their expert are baseless (id. at 23–26.) SST did not make any specific objections to the amount or reasonableness of Kayak's fee calculation.

SST's arguments do not always respond directly to the issues presented by Kayak, so the Court will limit its discussion to the specific arguments presented by the movant, Kayak. To the extent SST presents relevant affirmative arguments that the case is not exceptional, the Court will address those where appropriate.

[5] Kayak noted for the Court that its request for fees may overlap with the request for costs and expressly does not seek double recovery if any costs granted by the Clerk overlap with the fee request. (See Def.'s Mot. Br. at 13.)

### A. The Meaning of "Quote"

The dispute between the parties on this issue is whether or not the agreed upon construction of the term "quote" to mean "price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance"[6] means that the offer is "binding" as Kayak believes, or can be subject to conditions as SST submits. Kayak's argument is that because the construction requires a binding offer, and because this construction was known to SST before the litigation, SST's continued attempts to argue that the construction allows for a non-binding offer renders this case "exceptional" under 35 U.S.C. § 285. (Def.'s Mot. at 7–12.) SST responds that its position was both reasonable and correct, that SST never changed its understanding of what "quote" means, and that to change its position as Kayak suggests it did would not have aided SST in this litigation. (Pl.'s Opp. at 6–19.)

From the Federal Circuit's opinion in Lending Tree it appears that the source of the dispute may arise from the following quote where the court distinguished the claims of the '328 Patent from a piece of prior art:

> The record shows that some of these points about this critical prior art reference remain in factual dispute. For instance, the record reflect that the "quotes"

[6] This was the construction of the term put forth by the Federal Circuit. See Lending Tree, 588 F.3d at 1071, 1075.

> forwarded back to the potential customers in the FAST system were "non-binding, inventory availability responses, not contractual offers." Thus, even where a FAST customer pre-authorized the system to submit an offer on their behalf, this prior art system did not forward a "quote" from a seller, as the term was effectively construed by the district court. Indeed, the potential seller retained the option to reject or to renegotiate the terms of the offer.

Lending Tree, 588 F.3d at 1072 (first emphasis added, second emphasis in original). Kayak seems to read into this that because the offers from the prior art system, which were found not to anticipate the claims of the '328 Patent, were non-binding, then "quote" in the '328 Patent must mean a binding offer.

The Federal Circuit in Lending Tree appears to have meant that for the offer to be "binding" it must be an offer such that the potential seller would not be able to reject or renegotiate the terms. At summary judgment, Kayak argued that because the results displayed on Kayak's website are subject to availability, its offers were not binding. Summary Judgment Opinion, slip op. at 21. SST responded that the court in Lending Tree had noted that "the '328 patent arguably envisions conditions, such as credit verification, that must still be satisfied before a transaction is complete." Id. at 22 (quoting Lending Tree, 588 F.3d at 1075). SST also pointed to Figure 8 of the '328 Patent which purports to be an embodiment of the claimed invention, showing a returned quote that states that the

quote is "Subject to Prior Sale," i.e., subject to availability. Id.

The Court in ruling on this issue made clear that a quote could be subject to certain conditions, and "could be a binding contract if the seat is available at that price point," but explained that "requiring further negotiations and consummation with the third party at a later time for acceptance does not constitute an offer capable of acceptance on Kayak's system." Id. at 22–23. Thus, the Court cannot now accept Kayak's characterization that SST was unreasonably shifting positions and attempting to mislead Kayak about how it interpreted the agreed upon construction for the term "quote." (See Def.'s Reply at 3 & n.2).[7]

Kayak's remaining arguments with respect to this issue are based around conduct with respect to the summary judgment motions in front of this Court and in front of the Special Master, and that SST misled the Special Master. (See Def.'s Mot. at 9–12.) The Court disagrees with Kayak's characterization of the proceedings. Examining the record

[7] The Court in deciding summary judgment did remark that SST could not be "a chameleon" and argue that a "quote" could be something that the requester could not accept. See Summary Judgment Opinion, slip op. at 24. However, since the Court found that conditions could in fact be attached to the "quote" as explained, the Court will not now read further into the remark.

submitted to the Special Master (see Special Master Materials (redacted) [Dkt. No. 254] (unredacted and sealed) [Dkt. No. 256]) as well as the extensive record developed in briefing claim construction and multiple summary judgment motions before this Court, this Court does not see that SST engaged in any "misdirection" that could "derail[ ] summary judgment." (See Def.'s Mot. at 9.) Kayak's displeasure at the Court finding that there were certain disputed facts that precluded summary judgment is not grounds for finding the case "exceptional" under 35 U.S.C. § 285. There were no manufactured disputes here. Rather, this presents a disputed interpretation of a claim construction wherein both parties disagreed with each other, and neither side had an unreasonable interpretation of the agreed upon construction.

Applying the Octane Fitness standard, this is not a case in which there has been any unreasonable conduct on behalf of SST, nor does this aspect of the case present a need for deterrence. Accordingly, the Court will deny Kayak's Motion with respect to SST's arguments regarding the meaning of "quote" as a claim term in the '328 Patent.

**B. The Meaning of "Software" and Alice Briefing**

Additionally, Kayak argues that SST's positions with respect to the meaning of "software" in arguing that its patents

were directed toward patent eligible subject matter were inappropriate based on arguments SST made to the PTO during reexamination and in an expert declaration proffered during claim construction. (Def.'s Mot. Br. at 12–13.) Kayak further argues that once the Alice decision was handed down by the Supreme Court in June of 2014, SST should have discontinued the litigation as the '328 Patent was clearly directed toward patent ineligible subject matter. (Def.'s Reply at 6–7.) SST responds that the law regarding patent eligible subject matter under 35 U.S.C. § 101 was too unsettled in the wake of Alice and that "SST's pursuit of this litigation, despite ultimately not prevailing, cannot be deemed meritless or exceptional in any way." (Pl.'s Opp. at 19–22.)

The test under Alice for determining validity under 35 U.S.C. § 101 is a two-step process inquiring into (1) whether the patent is directed toward patent ineligible subject matter, i.e., laws of nature, natural phenomena, or abstract ideas; and (2) if so, whether the claims include a so-called "inventive concept" which means that "the additional elements 'transform the nature of the claim' into a patent-eligible application." Alice, 134 S. Ct. at 2355 (citing Mayo Collaborative Servs. v. Prometheus Labs., Inc., 132 S. Ct. 1289, 1294–97 (2012)). What is interesting here is that SST indeed conceded the first step. Invalidity Opinion, 111 F. Supp. 3d at 607–08. Thus, the only

issue was whether the patent survived under the second step of the Alice test. Kayak has submitted that is what makes the case exceptional -- that SST had effectively conceded the second step of the Alice test as well in previous briefing, but then reversed course in arguing for validity. (Def.'s Mot. Br. at 12–13; Def.'s Reply at 6–7.) Kayak does not appear to be arguing that SST's position during briefing was objectively unreasonable in a vacuum; rather, Kayak is arguing that the constant changing of position is what makes SST's position unreasonable.

It is necessary to evaluate what SST has argued at various stages of prosecution and litigation. During reexamination of the '328 Patent, in order to traverse a rejection based on prior art, SST represented to the PTO that the claimed invention required two distinct databases -- at least one vendor database and a central database that would then pull quote terms from different vendor databases. (Office Action Response of July 31, 2012 at JA1475–80.)[8] SST specifically stated, "To pull the terms of a quote from the vendor database at the 1995 time of the present invention was no small task. It required a specific

[8] The full reexamination history of the '328 Patent as well as the original prosecution history of the '328 Patent were submitted as part of a joint appendix for the Markman hearing and separately paginated with "JA" pages numbers, found at Dkt. No. 86. The Court will cite to this joint appendix for any references to the file history or reexamination history.

software interface to be set up between the central computer and the vendor computers . . . ." (Id. at JA1478 n.4 (emphases added).)

Then, in its responsive Markman brief submitted slightly over a year later in October 2013, SST submitted a declaration from Dr. Pramod Pancha. (See Pancha Decl. [Dkt. No. 84-1].) SST relied on Dr. Pancha's declaration to argue that the claim limitation of a "means . . . for generating quotes" is sufficiently definite in view of the specification of the '328 Patent to a person of ordinary skill in the art. (Pl.'s Resp. Markman Br. [Dkt. No. 84] at 11–13.)[9] In making that argument, Dr. Pancha explained that the specification of the '328 Patent "indicates that the system interrogates the vendor product database and cross references into the inventory retrieve pricing and other information necessary to generate the quote." (Pancha Decl. ¶ 5.) Dr. Pancha further explained that "software to perform a database query and pull specified items was well known and in wide use for many years" before the '328 Patent was filed, and that "database query systems go back decades before that, and anyone with a basic software background would have known so at the time." (Id. ¶ 6 (emphases added).) He then

[9] Dr. Pancha's declaration was ultimately excluded from consideration during the Markman hearing due to SST's failure to comply with the Local Patent Rules. See Markman Opinion, 2014 WL 314665, at *11.

opined that in light of the disclosure of the ’328 Patent and the prior art “it would be a very simple matter to write a small piece of code to pull the terms desired from the vendor database, assemble them into a data structure and form a quote from it.” (Id. ¶ 7.) The Court noted in its Markman Opinion that this argument from Dr. Pancha was not in line with what SST had argued to the PTO in its Office Action Response of July 31, 2012. Markman Opinion, 2014 WL 314665, at *11 n.17. The Court ultimately concluded that the limitation of a “means . . . for generating quotes” was indefinite, rendering the claims containing the limitation invalid. See id. at *12.

When it came to briefing the issue of patent eligible subject matter, SST then submitted to the court that the “inventive concept” under the second step of the Alice test for the remaining claims of the ’328 Patent was the “specialized predefined software interface” that “allows the central computer to retrieve numerous material contract terms from the vendor computer.” (Pl.’s Opp. to Mot. for Summ. J. of Invalidity [Dkt. No. 248] at 5.) As support for this, SST pointed to the Office Action Response of July 31, 2012, citing to the same footnote that argued it “was no small task” to set up the software. (See id. at 5, 9, 13, 18.)

Kayak submits it is this back-and-forth in SST’s position that renders its conduct exceptional. (Def.’s Mot. Br. at 12–

13; Def.'s Reply at 6–7.) SST first responds that no inconsistency exists. (Pl.'s Opp. at 25.) SST argues that it told the PTO that the invention required establishing a software interface, and that Dr. Pancha's declaration merely affirms that by saying a person of skill in the art would know how to write code to create the interface. (Id.) The Court disagrees with SST and finds that there is an inconsistency when comparing the position taken before the PTO and during Alice briefing with the position taking during Markman briefing. SST's argument overlooks the manner in which the tasks are described. To the PTO, SST made this task sound like a Herculean undertaking, whereas before this Court in the Markman proceeding, SST's expert said it would be a routine task. Further, Dr. Pancha makes clear that this type of database query, from one database to another, was something known in the art for decades prior to the filing of the '328 Patent. The inconsistency is subtle, but it is apparent from the papers.

SST further argues that even if an inconsistency exists, experts are allowed to disagree with the party proffering their evidence. (Pl.'s Opp. at 26.) This is a true statement, but an inapposite argument. SST expressly relied on Dr. Pancha's declaration in telling this Court that the claim term "means . . . for generating quotes" was adequately claimed under 35 U.S.C. § 112. (Pl.'s Resp. Markman Br. at 11–13.) In relying on Dr.

Pancha's declaration, SST adopted the arguments made by Dr. Pancha; to argue otherwise would be disingenuous.[10] SST cannot in one breath cite to Dr. Pancha's statements in support of their arguments, and in the next disclaim them as being opinions merely of the expert and not of SST.

In summary, SST first argued for patentability based on it being "no small task" to create a database query, then argued for a claim construction based on the fact that a person of ordinary skill in the art would have been able to use software that existed "for decades" prior to the '328 Patent to make a database query, and finally argued for patent eligible subject matter based on the "inventive concept" of a specialized software to make the database query. The Court agrees with Kayak that SST changed its positions back and forth to suit the argument of the day.

What is interesting, however, is the fact that SST's position during Alice briefing is the same as its position in submissions to the PTO. Had SST not been inconsistent during its Markman briefing, there would be no argument here that SST had argued the opposite of its Alice position earlier in the

[10] SST's argument that Kayak's expert on the travel industry disagreed with Kayak's corporate representative is distinguishable as those disagreements happened within the context of depositions, and not in the context of submissions to this Court or the PTO.

litigation. But that is not the case. If SST had tried to change course only once and maintained a consistency between its Markman briefing and Alice briefing, no argument could have been sustained regarding an "inventive concept" to save the patent from being directed toward an abstract idea. The Court sees no reason why SST should not be held to its earlier positions in the litigation, even if that position is itself inconsistent with a position taken even earlier.

However, this does not mean that SST had an affirmative duty to immediately drop their case once the Supreme Court decided Alice. Rather, it was only upon the filing of Kayak's motion for summary judgment on invalidity under 35 U.S.C. § 101 that SST should have discontinued the litigation. This was the unreasonable conduct engaged in by SST -- changing positions again in order to try and save the validity of the patent. Under the Octane Fitness standard, the Court finds this supports a declaration that this case is "exceptional" under 35 U.S.C. § 285, in that this flip-flopping "stands out from others with respect to the substantive strength of a party's litigating position." See Octane Fitness, 134 S. Ct. at 1756. The Court will, in its discretion, award attorneys' fees to Kayak for services rendered after Kayak filed its initial Alice brief. The Court notes that Kayak did not indicate that it was seeking fees for preparing the instant fee motion. Accordingly, fees

are not granted for any work done with respect to the fee motion.

### C. Entitlement to Expert Fees and Further Costs

Kayak also requests that because of the bad conduct of SST, this Court impose Kayak's expert fees and additional costs beyond what the Clerk found taxable on SST as a sanction under 28 U.S.C. § 1927 or the Court's inherent power to sanction. (See Def.'s Mot. at 5–6.) Ordering expert fees as a form of sanctions "is reserved for cases where the district court makes a 'finding of fraud or bad faith whereby the very temple of justice has been defiled.'" MarcTec, LLC v. Johnson & Johnson, 664 F.3d 907, 921 (Fed. Cir. 2012) (quoting Amsted Indus. Inc. v. Buckeye Steel Castings Co., 23 F.3d 374, 378 (Fed. Cir. 1994) (internal quotations omitted)).[11] "The use of this inherent power is reserved for cases with 'a finding of fraud or abuse of the judicial process.'" Takeda Chem. Indus., Ltd. v. Mylan Labs, Inc., 549 F.3d 1381, 1391 (Fed. Cir. 2008) (quoting Amsted, 23 F.3d at 378). Even considering SST's changing position on the meaning of "software," this is not the type of case to rise to such a level. Further, no evidence has been submitted that SST

[11] Although Federal Circuit case law is not binding on this issue, it is persuasive.

"intentionally and unnecessarily delay[ed] judicial proceedings." See In re Prosser, 777 F.3d at 161.

The fee shifting provision of the Patent Act provides only for the award of "reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. Kayak has not met its burden of demonstrating to this Court that it is entitled to anything more than its attorneys' fees under 35 U.S.C. § 285, and as such any request for sanctions under 28 U.S.C. § 1927 or the Court's inherent power to sanction will be denied.

**D. Calculation of Fees**

Having concluded that at least a portion of this case is "exceptional" under 35 U.S.C. § 285 and awarding fees to Kayak in its discretion, the Court next will determine the amount of fees to which Kayak is entitled. Local Civil Rule 54.2 governs fee awards, and requires the party seeking fees to provide certain materials to the Court, including affidavits setting forth the nature of services rendered, a record of the dates and times of services rendered, a description of the services rendered on each date, a description of the professional experience of each person rendering services, the normal billing rate for each person rendering services, any fee agreements, and the amounts actually billed to the client and paid by the client. See L.Civ.R. 54.2(a)–(b).

Case: 17-1384 Document: 14 Page: 73 Filed: 01/26/2017

"The determination of reasonable attorney fees is . . . 'a matter that is committed to the sound discretion' of a district court judge." Lumen View Tech. LLC v. Findthebest.com, Inc., 811 F.3d 479, 483 (Fed. Cir. 2016) (quoting Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 558 (2010)). "In calculating an attorney fee award, a district court usually applies the lodestar method, which provides a presumptively reasonable fee amount by multiplying a reasonable hourly rate by a reasonable number of hours required to litigate a comparable case." Id. (citing Perdue, 559 U.S. at 551, 554); see also Sullivan v. DB Investments, Inc., 667 F.3d 273, 330 (3d Cir. 2011) (explaining that the lodestar method is typically applied in this circuit in statutory fee shifting cases). "The party seeking attorney's fees has the burden to prove that its request for attorney's fees is reasonable.

To meet its burden, the fee petition must 'submit evidence supporting the hours worked and rates claimed.'" Rode v. Dellarciprete, 892 F.2d 1117, 1183 (3d Cir. 1990) (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)); accord Wagner v. Shinseki, 733 F.3d 1343, 1349 (Fed. Cir. 2013). Even if the fee motion is unopposed, the party seeking fees still must meet its burden of proving reasonableness." See Spectrum Produce Distrib., Inc. v. Fresh Mktg., Inc., Civ. No. 11-6368 (JBS/KMW), 2012 WL 2369367, at *3 (D.N.J. June 20, 2012) ("Even in a

default judgment case, therefore, Plaintiff must establish the threshold reasonable lodestar to the Court's satisfaction.")

**1. Hourly Rate**

In order to apply the lodestar method, the Court must first determine the appropriate hourly rate for each person rendering services. "To show the reasonableness of a requested rate, counsel 'must produce satisfactory evidence -- in addition to their own affidavits -- that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" Spectrum Produce, 2012 WL 2369367, at *4 (internal modifications omitted) (quoting Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984)).

Kayak was represented by numerous attorneys in this case, but only seeks fees for the Boston-based attorneys at K&L Gates, LLP who performed "the vast majority of the work" in this matter. (Cotter Decl. [Dkt. No. 284-2] ¶ 5.) Those five attorneys include two partners, two associates, and one attorney who was elected to partnership during the pendency of the case. (See id. ¶¶ 18–19.) Firm biographies were submitted for each of the five attorneys, (see Cotter Decl. Exhibits [Dkt. No. 284-3], Ex. J), and their experience briefly summarized in the attorney declaration submitted on behalf of Kayak, (see Cotter Decl.

¶ 18). Kayak requests different rates for each of the five attorneys, ranging from a low of $337/hour to a high of $781/hour. (Id. ¶ 19.)

In order to establish the prevailing rate for this type of litigation, Kayak refers to the Report of the Economic Survey prepared by the American Intellectual Property Law Association ("AIPLA") in 2013 (the "AIPLA Report"). However, Kayak has failed to submit the AIPLA Report into the record for this Court's review. (See Cotter Decl. ¶ 20 (referring the Court to AIPLA's website where the AIPLA report is only available for a fee).)[12] Kayak does offer that the range of billing for all intellectual property work nationwide based on the AIPLA report ranges from $267/hour to $768/hour. (See id.) On this alone, Kayak's requested fees for certain of its attorneys are outside the average range. (See id. ¶ 19 (requesting $781/hour for the highest billing attorney).) Kayak offers no evidence aside from

---

[12] The Court notes that Kayak should have been aware of this issue. Kayak pointed to the decision of the court in Accusoft Corporation v. Quest Diagnostics, Inc., No. 12-cv-40007, 2014 WL 1393749 (D. Mass. Apr. 7, 2014), as evidence that a previous court found its attorney's requested rate of $750/hour reasonable. (See Cotter Decl. ¶ 20.) In the very same footnote to which Kayak refers this Court in support of its rate being reasonable, the court in Accusoft remarked "To support their claim that their rates are reasonable, Defendants submitted a link to the American Intellectual Property Law Association's 2013 Report of the Economic Survey. The Court was not able to access the information via the link." Accusoft, 2014 WL 1393749, at *2 n.5 (citation omitted).

the declaration of its own attorney for why this Court should grant a fee above the average range.

Faced with an absence of evidence, the Court cannot say that any of Kayak's requested fees are reasonable. In light of this deficiency, Kayak's will be granted leave to supplement its filings. More specifically, Kayak will be granted leave to file supplemental documentation in support of the reasonableness of the hourly rates requested for each attorney within fourteen (14) days of the entry of the accompanying order. If Kayak still wishes to rely on the AIPLA Report, then Kayak must submit the actual document into the record. SST will not be permitted any response having failed to raise any initial objection to the reasonableness of the rates requested.

**2. Time Reasonably Expended**

Although unable to determine the reasonableness of the rates requested, the Court will proceed to the next step in the lodestar analysis, which is to determine the hours reasonably expended by Kayak's attorneys. As explained above, Local Civil Rule 54.2 requires detailed affidavits and supporting documents that include a record of the dates on which services were rendered, a description of the services rendered on each date, an identification of who rendered services on each date, and the

time spent rendering such services on each date. See L.Civ.R. 54.2(a).

However, Kayak has only proffered a summary of invoices that reflect the date of the invoice, the amount of fees, and the amount of costs for each invoice, (see Cotter Decl. Exhibits, Ex. A), and a summary of how many hours each attorney billed, (see id. at Ex. B). As other courts of this district have explained, this is insufficient to comply with the requirements of Local Civil Rule 54.2. See, e.g., Holt's Co v. Hoboken Cigars, LLC, Civ. No. 09-3782 (WJM), 2010 WL 4687843, at *5 (D.N.J. Nov. 10, 2010) (rejecting a request for fees where the party "merely provide[d] a final total of hours per attorney as well as their billing rates" and requiring "descriptive time entries or other support" in accordance with Local Civil Rule 54.2); Downey v. Coalition Against Rape & Abuse, Inc., Civ. No. 99-3370 (JBS), 2005 WL 984394, at *10 (D.N.J. Apr. 27, 2005) (requiring a more specific breakdown of time and effort expended by the attorney on specific tasks to support a partial fee award). This Court is similarly not satisfied with the generalized descriptions of the work done, as the Court cannot evaluate the amount of time spent by each attorney in their work, nor can the Court accurately determine what work falls within its limited fee award.

Accordingly, Kayak will be granted leave to file supplemental documentation in support of the reasonableness of the time expended by each attorney within fourteen (14) days of the entry of the accompanying order. Kayak's supplemental submission is limited only to those hours that fall within the ambit of this Court's limited fee award -- the hours expended on this case subsequent to the filing of Kayak's initial Alice brief. Because Kayak did not delineate with any specificity the time spent on each task or the time each attorney spent on the task in this initial fee petition, SST will be granted leave to file objections to Kayak's supplemental submission within fourteen (14) days of the supplemental documentation being filed.[13]

## V. CONCLUSION

For the foregoing reasons, the Court will grant-in-part Defendant Kayak's Motion to declare this case "exceptional" pursuant to 35 U.S.C. § 285 and award attorneys' fees to Kayak

[13] This is clearly in contrast to not permitting SST a response with respect to the rates requested. However, Kayak did at least explain who was requesting what rate, why the rates were requested for each attorney, and provide a biography for each attorney. This was sufficient information for SST to lodge an objection that the requested rates were too high or otherwise unreasonable. SST has not been afforded the same opportunity here where Kayak merely provided a total number of hours each attorney billed and the total number of hours billed per month without allocating those hours to any task.

for hours expended after Kayak filed its initial motion for summary judgment of invalidity under 35 U.S.C. § 101. Defendant's Motion is otherwise denied.

Kayak will be granted leave to file supplemental documentation in support of its fee request within fourteen (14) days as explained above. SST will be granted leave to file supplemental objections only to the hours requested by Kayak within seven (7) days of Kayak's supplemental submission.

Date: March 31, 2016

s/ Noel L. Hillman
NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

SOURCE SEARCH TECHNOLOGIES, LLC,

Plaintiff,

v.

KAYAK SOFTWARE CORPORATION,

Defendant.

Civil No. 11-3388(NLH/KMW)

**OPINION**

**APPEARANCES:**

KAPLAN BREYER SCHWARZ & OTTESEN, LLP
By: Jeffrey I. Kaplan, Esq.
Daniel Basov, Esq. (pro hac vice)
100 Matawan Road
Matawan, New Jersey 07747
Counsel for Plaintiff Source Search Technologies, LLC

K&L GATES LLP
By: Rosemary Alito, Esq.
C. Bryan Cantrell, Esq.
One Newark Center, Tenth Floor
Newark, New Jersey 07102

By: John J. Cotter, Esq. (pro hac vice)
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111
Counsel for Defendant KAYAK Software Corporation

**HILLMAN**, United States District Judge:

This patent suit is before the Court for a final order of attorneys’ fees pursuant to the Court’s Opinion of March 31, 2016 [Dkt. No. 295], reported at Source Search Technologies, LLC

v. Kayak Software Corp., 2016 WL 1259961 (D.N.J. Mar. 31, 2016) ("Fee Opinion"), and corresponding Order [Dkt. No. 296]. Reconsideration of the Fee Opinion was denied by this Court in an Opinion dated December 19, 2016 ("Reconsideration Opinion") and corresponding Order. Consistent with the Fee Opinion and Order, Defendant KAYAK Software Corporation ("Defendant" or "Kayak") and Plaintiff Source Search Technologies, LLC ("Plaintiff" or "SST") have made supplemental filings, and Kayak has requested leave to file a reply brief to SST's submission [Dkt. No. 304]. For the following reasons, the Court will **GRANT** Kayak's request to file a reply brief and award $578,085.05 to Kayak as an award for attorneys' fees pursuant to 35 U.S.C. § 285.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The factual background and procedural history of this case have been set out at length in the Court's multiple recent opinions. See, e.g., Fee Op., 2016 WL 1259961, at *1–2. What is relevant here is that the Court declared this case exceptional pursuant to 35 U.S.C. § 285 and awarded Kayak attorneys' fees "for services rendered after Kayak filed its initial Alice[1] brief." Id. at *7. Based on Kayak's

[1] Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 134 S. Ct. 2347 (2014).

Case: 17-1384 Document: 14 Page: 82 Filed: 01/06/2017

submissions at the time, the Court was unable to determine what the amount of the fee would be. Id. at *9–10. The Court permitted Kayak to file supplemental documentation in support of its fee request to (1) establish the reasonableness of the hourly rate requested for each attorney; and (2) clearly outline the hours spent by each attorney on each task in accordance with Local Civil Rule 54.2. Id. SST was permitted to file a response to Kayak's submissions only with respect to the hours expended by the attorneys. Id. No response was permitted by SST with respect to the reasonableness of the rate requested by Kayak. Id.

While the ordered supplemental submissions were being filed, SST filed a motion for reconsideration of the Fee Opinion. (See SST Motion for Reconsideration [Dkt. No. 300].) While that motion was pending, SST also filed a notice of appeal regarding the Fee Opinion which was subsequently dismissed for lack of jurisdiction. The Motion for Reconsideration was subsequently denied. See generally Reconsideration Op.

As explained in the Fee Opinion, the Court exercises subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## II. LEGAL STANDARD

"The methodology of assessing a reasonable award under 35 U.S.C. § 285 is within the discretion of the district court."

Mathis v. Spears, 857 F.2d 749, 755 (Fed. Cir. 1988)) (citation omitted). "The determination of reasonable attorney fees is . . . 'a matter that is committed to the sound discretion' of a district court judge." Lumen View Tech. LLC v. Findthebest.com, Inc., 811 F.3d 479, 483 (Fed. Cir. 2016) (quoting Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 558 (2010)).

As this Court previously explained, in determining fees here, it will use the lodestar method. See Fee Op., 2016 WL 1259961, at *8.

**III. DISCUSSION**

As explained in the Fee Opinion, Local Civil Rule 54.2 governs fee awards, and requires the party seeking fees to provide certain materials to the Court. Fee Op., 2016 WL 1259961, at *8; see also L.Civ.R. 54.2(a)–(b). Kayak initially did not satisfy the requirements of the Local Rule, resulting in the supplemental filings. Based on the supplemental filings from the parties, the Court will go through the lodestar analysis and determine the appropriate amount of the fee award.

**A. Procedural Matters**

The Court will briefly address two procedural matters that arose during the course of the supplemental filings.

First, Kayak has filed an unopposed motion to seal unredacted copies of bills from K&L Gates, LLP to Kayak. (See Kayak Mot. Seal [Dkt. No. 299].) Motions to seal are governed

in this district by Local Civil Rule 5.3(c). The Court finds that the submissions demonstrate that confidential business information is contained in the bills and that harm would occur if this information was not sealed, as revealing the nature of services provided by an attorney to her client can reveal litigation strategy and provide a guide to future adversaries of how the client may proceed in similar litigation. See Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1071 (3d Cir. 1984); United States v. Keystone Sanitation Co., 885 F. Supp. 672, 675 (M.D. Pa. 1994) (recognizing a privilege in time sheets that "reveal litigation strategy and/or the nature of the services performed"); see also Travelers Prop. Cas. Co. of Am. v. Centex Homes, No. 11-3638, 2013 U.S. Dist. LEXIS 26241, at *4–5 (N.D. Cal. Feb. 26, 2013) (permitting redaction of bills to preclude revelation of litigation strategy and the nature of services provided). Accordingly, Kayak's Unopposed Motion to Seal will be granted.

Second, Kayak has filed a letter requesting leave to file a reply to SST's submission. (See Kayak Reply Br. Letter [Dkt. No. 304].) The Court finds a reply brief appropriate in this situation, and therefore grants the request and will consider the arguments contained in Kayak's proposed reply brief [Dkt. No. 304-1].

**B. Hourly Rate**

In order to apply the lodestar method, the Court must first determine the appropriate hourly rate for each person rendering services. As previously explained:

> Kayak was represented by numerous attorneys in this case, but only seeks fees for the Boston-based attorneys at K&L Gates, LLP who performed "the vast majority of the work" in this matter. Those five attorneys include two partners, two associates, and one attorney who was elected to partnership during the pendency of the case. Firm biographies were submitted for each of the five attorneys, and their experience briefly summarized in the attorney declaration submitted on behalf of Kayak. Kayak requests different rates for each of the five attorneys, ranging from a low of $337/hour to a high of $781/hour.

Fee Op., 2016 WL 1259961, at *9 (citations omitted).

In its supplemental submission, Kayak explains that it is now only seeking fees for four attorneys, because one of the five attorneys did not bill for services during the time period for which the Court has permitted recovery of attorneys' fees. (Cotter Supp. Decl. [Dkt. No. 297-1] ¶ 12.) Kayak also now requests a higher rate for each attorney, now ranging from a low of $485.00/hour to a high of $822.14/hour. (Id. ¶ 13.) This appears to be a result of the attorneys charging more for their services each year, so by removing the earlier portion of the case from the recovery period, the average hourly rate for each attorney increased. (See id. ¶ 7.)

The purpose of ordering supplemental submissions from Kayak with respect to the hourly rate was to satisfy the Court that the originally requested rate was reasonable and appropriate, not to provide Kayak an opportunity to enhance the requested rates for its attorneys. The Court does not believe that a shortened recovery period should result in a rate higher than that originally requested. Accordingly, the Court will be evaluating the reasonableness of the originally requested rates as set forth in Kayak's initial submission: $781/hour for John J. Cotter, Esq.; $682/hour for Christopher H. Centurelli, Esq.; $447/hour for James A. Culverwell, Esq.; and $422/hour for Andrea B. Reed, Esq. (Cotter Initial Decl. [Dkt. No. 284-2] ¶ 19.)

"Where the party opposing fees fails to make a specific opposition to the rate requested, and where the rate is certified to be commensurate with the prevailing market rates in the community, the Court may determine that the rate is appropriate." Garfum.com v. Reflections by Ruth, Civ. No. 14-5919 (JBS/KMW), 2016 WL 1242762, at *12 (citations omitted). According to the 2013 Report of the Economic Survey from the American Intellectual Property Law Association (the "AIPLA Report" (Cotter Supp. Decl. Ex. L)), these rates are below the third quartile number of $929.00/hour charged by attorneys in firms with over 100 attorneys. (See AIPLA Report at F-23.)

This information, taken in conjunction with the professional experience of the four attorneys (see Cotter Initial Decl. ¶ 18 & Ex. J) and the Court's awareness of the complexity of patent litigation work generally, leads the Court to conclude that the requested rates are reasonable.

Additionally, Kayak disclosed that there was a 5% discount of the fees charged to Kayak by K&L Gates beginning in February 2015. (See Cotter Supp. Decl. ¶¶ 11, 14.) Accordingly, the Court finds that the hourly rate for each attorney is as follows:

| | |
|---|---|
| Cotter: | $781.00/hour (through January 2015)<br>$741.95/hour (February 2015 onwards) |
| Centurelli: | $682.00/hour (through January 2015)<br>$647.90/hour (February 2015 onwards) |
| Culverwell: | $447.00/hour (through January 2015)<br>$424.65/hour (February 2015 onwards) |
| Reed: | $422.00/hour (through January 2015)<br>$400.90/hour (February 2015 onwards) |

**C. Time Reasonably Expended**

Turning to the time expended by each attorney, SST has raised objections to the hours requested. First, SST argues that any fees from July and August that were incurred after the case was dismissed should not be considered. (See SST Supp. Opp. [Dkt. No. 302] at 1.) Second, SST wants to reduce the recovery period from the filing of Kayak's Alice motion to the filing of SST's opposition. (See id. at 1–2.) Third, SST seeks

a blanket 75% reduction of hours from February 2015 through June 2015. (See id. at 2–6.) Kayak opposes each of these as improper requests. (Kayak Reply [Dkt. No. 304-1].)

**1. Work in July and August 2015**

With respect to work from July and August, SST submits that the work relates entirely or almost entirely to Kayak's work on its motion to tax costs. (SST Supp. Opp. at 1.) SST argues that work on taxing costs "would have been required even if the case had been voluntarily dismissed" after Kayak submitted its Alice motion and there had been no finding of an exceptional case. (Id.) Kayak responds that "there is no requirement to 'pars[e] out the charges' attributable to the exceptional conduct." (Kayak Reply at 3 (quoting Brassler, U.S.A. I, L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1386 (Fed. Cir. 2001)).)

The Court agrees with Kayak. The purpose of attorneys' fee awards under 35 U.S.C. § 285 is two-fold: (1) to compensate the prevailing party; and (2) to deter bringing improper patent suits. Automated Business Cos., Inc. v. NEC Am., Inc., 202 F.3d 1353, 1355 (Fed. Cir. 2000) (citations omitted). Kayak has pointed to Brassler in support of its position, which is not entirely supportive. In Brassler, the plaintiff had committed inequitable conduct, and the Federal Circuit refused to parse out certain fees, noting that the defendant "would not have incurred any of the fees generated in defense of this suit had

[plaintiff] not committed inequitable conduct in pursuit of its patent and had it not filed a claim for infringement of that patent." 267 F.3d at 1386. This is not the same situation here, where Kayak indeed would have been able to file a motion to tax costs had SST dropped its case, as SST argues. However, it is unquantifiable by how much the continued pursuit of the case required Kayak to expend more resources in its motion to tax costs. It is also possible -- though unlikely -- that Kayak would have foregone a motion to tax costs in light of the voluntary dismissal by SST. Regardless, the Court does not see any error in awarding full fees for the hours expended by Kayak in July and August of 2015. SST's objections to these fees are denied.

**2. Work in January 2015**

Turning to SST's next objection, SST argues that this Court should reduce the recovery period from the date of Kayak filing its Alice motion to the date of SST filings its opposition. (SST Supp. Opp. at 1–2.) Kayak responds that this is an improper request for reconsideration, as the Court already held that the recovery period would run from the date of Kayak's filing. (Kayak Reply at 1–2.)

The Court again agrees with Kayak. The recovery period was determined in the Fee Opinion, and if SST disagreed with the period set out by the Court, SST could have filed a motion for

reconsideration on that point. The motion for reconsideration filed by SST did not address this point, and the Court will not give SST a second chance to argue a point for reconsideration. SST's objection as to fees from January 2015 is denied.

**3. Blanket 75% Reduction for Work from February 2015 to June 2015**

Finally, SST argues that Kayak's fees should be reduced by 75% because the amount of work required on the Alice reply brief, accompanying oral argument, and submissions to the special master were minimal, therefore the billing is excessive. (SST Supp. Opp. at 2–6.) Kayak responds that this is factually incorrect and points to SST's failure to submit its own billing records from that time as permitting the Court to draw a negative inference about SST's argument. (Kayak reply at 2–3.)

In arguing its objection, SST explains that the work done with respect to proceedings in front of the special master resulted in briefs from Kayak that "were largely similar, if not substantively identical, to the arguments it had already, just a short time before the Special Master proceedings, submitted to the Court, on the same issue, in support of its Motion for Summary Judgment of Noninfringement." (SST Opp. at 4–5.) However, SST does not actually point to any suspect billing entries or specifically call into question any entry made by Kayak as being excessive or improper. Rather, SST points to

cases that have permitted reductions between 64% and 77% without explaining how Kayak's bills fall within those cases. (See SST Opp. at 2–3 (citations omitted).)

Upon review of those cases, the Court does not believe that any apply to the instant case, and finds them all inapposite.[2] It is one thing to be permitted to apply a blanket reduction to hours; it is quite another to find a reason to apply such a reduction and at the high percentage requested by SST. SST has

[2] SST pointed to Doe ex rel. Estate of Doe v. Sec'y of Health & Human Servs., No. XX-XXXV, 2010 WL 529425, at *8 (Fed. Cl. Jan. 29, 2010) where the special master in the Vaccine Program recognized a difficulty of evaluating the petition due to "a lack of contemporaneous billing, misidentified or inadequately identified tasks performed, and block billing." However, the special master expressly held that it was not reducing hours due to block billing, but rather reducing the hours when it was readily apparent that preparing a 25-page post-hearing brief that consisted of thirteen pages of block quotes and four pages of legal standards did not take 77.7 hours. Id. Similarly, in Saxton ex rel. Saxton v. Sec'y of Dep't of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993), the court affirmed a special master in the Vaccine Program who reduced hours based on his experience and judgment for how long tasks should have taken, not as a result of block billing. In Mares v. Credit Bureau of Raton, 801 F.2d 1197, 1202–03 (10th Cir. 1986), the court affirmed the district court reducing hours where excessive hours reflected inexperience and improperly billing non-billable time, a situation not alleged here. In Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694, 711–14 (3d Cir. 2005), the court did reject the district court's fee award, but the objecting party had identified specific billing entries it found excessive, something SST has not done here. Similarly, in Public Interest Grp. of N.J., Inc. v. Windall, 51 F.3d 1179, 1188–89 (3d Cir. 1995), the court reversed and remanded a fee award where the magistrate judge had not adequately considered specific objections to specific charges, which SST has not done.

not objected to any specific entries from Kayak, or reasoned why the amount is excessive.

Further, SST's argument appears factually incorrect. Even if the Court were to assume that Kayak's arguments before the special master were so similar as to render the work duplicative, this does not reflect analysis of SST's arguments before the special master, preparing for a hearing before the special master, actually having a hearing, reviewing his decision, preparing objections to his decision, and reviewing and responding to SST's objections to special master's decision. The argument that because positions taken before the special master and before the Court earlier were similar it necessarily follows that the time charged must be excessive falls apart upon closer scrutiny.

The Court generally finds this objection lacking. In conducting a searching review of the bills, however, the Court does find a few entries so lacking in specificity that it cannot award fees. During the lead up to the hearing on the Alice motion, Mr. Centurelli has entries spanning a week that only read "Prepare for SJ hearing" and total 27.6 hours. (See Ex. N (sealed) at 62–63.)[3] This is contrast to Mr. Cotter who explains

[3] The Court does not think this information from the billing records requires sealing.

what tasks he was undertaking in preparing for the hearing. (See id.) The Court will discount these hours by 50%, reducing Mr. Centurelli's total hours by 13.8 hours.

For the remainder of the entries, the Court does not find any of the requested hours unreasonable in light of the multiple issues being litigated in this case, often simultaneously,[4] and finds that, except as noted, Kayak sufficiently supported the reasonableness of its time entries in its submissions.

**4. Total Hours**

Based on the Court's above findings in rejecting SST's objections to the fee award, the Court will award Kayak fees for the following amount of hours for each attorney:

| | |
|---|---|
| Cotter: | 101.7 (through January 2015)<br>337.4 (February 2015 onwards) |
| Centurelli: | 33.7 (through January 2015)<br>161.7 (February 2015 onwards) |
| Culverwell: | 97.4 (through January 2015)<br>118.1 (February 2015 onwards) |
| Reed: | 46.8 (through January 2015)<br>17.8 (February 2015 onwards) |

[4] However, Kayak is cautioned that its practice of block billing without independently allocating time to each task within the billing entry did complicate the Court's review of the fee award. In the future, Kayak's counsel may wish to avoid this problem by improving its billing practices to avoid the use of block billing.

**D. Calculating the Fee Award**

Based on the Court's above findings, the Court calculates the final fees to be awarded as follows:

| Attorney | Rate | Hours | Fee Amount |
|---|---|---|---|
| Cotter | $781.00/hour | 101.7 | $79,427.70 |
| | $741.95/hour | 337.4 | $250,333.93 |
| Centurelli | $682.00/hour | 33.7 | $22,983.40 |
| | $647.90/hour | 161.7 | $104,765.43 |
| Culverwell | $447.00/hour | 97.4 | $43,537.80 |
| | $424.65/hour | 118.1 | $50,151.17 |
| Reed | $422.00/hour | 46.8 | $19,749.60 |
| | $400.90/hour | 17.8 | $7,136.02 |
| | | **Total** | $578,085.05 |

Accordingly, SST will be ordered to pay Kayak $578,085.05 in attorneys' fees.

**IV. CONCLUSION**

For the foregoing reasons, the Court will award Defendant Kayak $578,085.05 in attorneys' fees, payable by Plaintiff SST. An appropriate order and judgment accompanies this opinion.

Date: December 19, 2016

__s/ Noel L. Hillman____
NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SOURCE SEARCH TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>KAYAK SOFTWARE CORPORATION,<br><br>Defendant. | : | Civil No. 11-3388(NLH/KMW)<br><br>**ORDER**<br>[Dkt. No. 300] |

**HILLMAN**, United State District Judge:

This matter having appeared before the Court upon Plaintiff Source Search Technologies, LLC's Motion for Reconsideration [Dkt. No. 300], and the Court having reviewed the parties' submissions; for the reasons set forth in an Opinion on even date herewith; and for good cause appearing:

**IT IS** on this 19th day of December, 2016,

**ORDERED THAT:**

(1) Plaintiff's Motion for Reconsideration shall be, and the same hereby is, **DENIED.**

s/ Noel L. Hillman
NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SOURCE SEARCH TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>KAYAK SOFTWARE CORPORATION,<br><br>Defendant. | Civil No. 11-3388(NLH/KMW)<br><br>**JUDGMENT** |

**HILLMAN**, United States District Judge:

This matter having come before the Court for a final award of attorneys' fees pursuant to the Court's Opinion of March 31, 2016 [Dkt. No. 295] and corresponding Order [Dkt. No. 296] and upon Defendant's Motion to Seal [Dkt. No. 299] and Defendant's Request for Leave to File a Reply [Dkt. No. 304]; the Court having considered the submissions of the parties; for the reasons explained in the Opinion of today's date as well as the Opinion of March 31, 2016; and for good cause appearing:

**IT IS** on this 19th day of December, 2016, hereby

**ORDERED** that Plaintiff shall pay Defendant a total attorneys' fee award of $578,085.05; and it is therefore

**ORDERED AND ADJUDGED** that Judgment be entered in favor of Defendant Kayak Software Corporation and against Source Search Technologies, LLC, in the amount of Five Hundred and Seventy-

Eight Thousand Eighty-Five Dollars and Five Cents ($578,085.05); and it is

**FURTHER ORDERED** that Defendant's Motion to Seal is **GRANTED**; and it is

**FURTHER ORDERED** that Defendants' Request for Leave to File a Reply is **GRANTED**; and it is

**FURTHER ORDERED** that the Clerk of Court shall **CLOSE** this case.

___s/ Noel L. Hillman______
NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SOURCE SEARCH TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>KAYAK SOFTWARE CORPORATION,<br><br>Defendant. | Civil No. 11-3388(NLH/KMW)<br><br>**OPINION** |

**APPEARANCES:**

KAPLAN BREYER SCHWARZ & OTTESEN, LLP
By: Jeffrey I. Kaplan, Esq.
Daniel Basov, Esq. (pro hac vice)
100 Matawan Road
Matawan, New Jersey 07747
Counsel for Plaintiff Source Search Technologies, LLC

K&L GATES LLP
By: Rosemary Alito, Esq.
C. Bryan Cantrell, Esq.
One Newark Center, Tenth Floor
Newark, New Jersey 07102

By: John J. Cotter, Esq. (pro hac vice)
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111
Counsel for Defendant KAYAK Software Corporation

**HILLMAN**, United State District Judge:

Plaintiff Source Search Technologies, LLC ("Plaintiff" or "SST") brought this patent action against Defendant KAYAK

Case: 17-1384 Document: 14 Page: 99 Filed: 01/06/2017

Software Corporation ("Defendant" or "Kayak") alleging infringement of U.S. Patent No. 5,758,328 (the "'328 Patent").

Presently before the Court is SST's Motion for Reconsideration ("SST's Motion" or "SST Mot.") [Dkt. No. 300]. For the reasons set forth below, SST's Motion will be **DENIED**.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Court, in an Opinion dated March 31, 2016 [Dkt. No. 295], reported at Source Search Techs., LLC v. Kayak Software Corp., Civ. No. 11-3388 (NLH/KMW), 2016 WL 1259961 (D.N.J. Mar. 31, 2016) ("Fees Opinion"), granted-in-part and denied-in-part Kayak's Motion for Attorneys' Fees. The Court set out the factual background and procedural history of this case in its Fees Opinion, 2016 WL 1259961, at *1–2, and will restate only what is relevant for the disposition of SST's Motion.

Kayak sought, inter alia, attorneys' fees and a declaration that the case was exceptional pursuant to 35 U.S.C. § 285. This request hinged on two different bases: (1) that SST had contradicted previous arguments made with respect to the meaning of the word "quote"; and (2) that SST contradicted previous arguments made to the U.S. Patent and Trademark Office (the "PTO") in reexamination with respect to the meaning of "software." Fees Op., 2016 WL 1259961, at *3. The Court rejected the first argument, finding no exceptional conduct on

Case: 17-1384 Document: 14 Page: 100 Filed: 01/06/2017

behalf of SST in its arguments regarding the meaning of "quote." Id. at *4–5. The Court accepted the second argument, and summarized its findings as follows:

> In summary, SST first argued for patentability based on it being "no small task" to create a database query, then argued for a claim construction based on the fact that a person of ordinary skill in the art would have been able to use software that existed "for decades" prior to the '328 Patent to make a database query, and finally argued for patent eligible subject matter based on the "inventive concept" of a specialized software to make the database query. The Court agrees with Kayak that SST changed its positions back and forth to suit the argument of the day.

Id. at *7.

As a result of this finding, the Court declared the case exceptional under 35 U.S.C. § 285, awarded partial attorneys' fees to Kayak, and ordered supplemental submissions to determine the amount of attorneys' fees. See id. at *7, 10–11. SST then timely filed this Motion for Reconsideration, and subsequently filed a Notice of Appeal [Dkt. No. 305].[1]

## II. JURISDICTION

As explained in the Fees Opinion, the Court exercises subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). See Fees Op., 2016 WL 1259961, at *2.

[1] On June 8, 2016, the United States Court of Appeals for the Federal Circuit dismissed the appeal for lack of jurisdiction because this Court had not quantified the amount of attorneys' fees. Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1345 (Fed. Cir. 2001). The mandate issued July 15, 2016.

**III. LEGAL STANDARD**

In this District, Local Civil Rule 7.1(i) governs motions for reconsideration. Local Civil Rule 7.1(i) will apply where no final judgment has been entered pursuant to Rule 54(b). See Warner v. Twp. of S. Harrison, 885 F. Supp. 2d 725, 747–48 (D.N.J. 2012). However, the standard for evaluating the request is the same as the standard under Rule 59(e). Id.

"The scope of a motion for reconsideration . . . is extremely limited." Blystone v. Horn, 664 F.3d 397, 415 (3d Cir. 2011). "The purpose of a motion for reconsideration is 'to correct manifest errors of law or fact or to present newly discovered evidence.'" Lazaridis v. Wehmer, 591 F.3d 666, 669 (3d Cir. 2010) (citing Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)). A motion for reconsideration "must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." Id. (citing N. River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995)).

"A party seeking reconsideration must show more than a disagreement with the Court's decision, and recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden."

Facteon, Inc. v. Comp Care Partners, LLC, Civ. No. 13-6765, 2015 WL 519414, at *1 (D.N.J. Feb. 9, 2015) (quoting G–69 v. Degnan, 748 F. Supp. 274, 275 (D.N.J. 1990)). "A motion for reconsideration should not provide the parties with an opportunity for a second bite at the apple." Tishcio v. Bontex, Inc., 16 F. Supp. 2d 511, 533 (D.N.J. 1998) (citation omitted).

## IV. DISCUSSION

SST asks this Court to reconsider is finding that the case was exceptional under 35 U.S.C. § 285. SST appears to argue that the Court has overlooked or misinterpreted evidence, and that this motion is needed to correct a clear error of law or prevent manifest injustice. (See generally SST Mot. Br. [Dkt. No. 300-1].)[2] In support of its position, SST argues two points: (1) that SST argued its patent solved two "computer centric" problems based on DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245 (Fed. Cir. 2014) separate and apart from its other arguments related to the inventive concept required by the test for patent eligible subject matter under Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 134 S. Ct. 2347 (2014) (SST Mot. Br. at 2–5); and (2) the Court misunderstood SST's argument related to

[2] SST's Motion never clearly articulates under which of the three prongs of the standard for a motion for reconsideration it is bringing its motion. However, it is clear that there has been neither an intervening change in controlling law nor any new evidence generated.

predistributed software (SST Mot. Br. at 6–10.) Both of these arguments fail.

With respect to its second position, the Court has already considered SST’s argument as it related to predistributed software. As this Court has stated before, “[t]he law in this District is clear that ‘[a] motion for reconsideration is improper when it is used to ask the Court to rethink what it had already thought through -- rightly or wrongly.’” Red Roof Franchising LLC, Inc. v. AA Hosp. Northshore, LLC, 937 F. Supp. 2d 537, 547 (D.N.J. 2013) (quoting Fishbein Fam. P’ship v. PPG Indus., Civ. No. 93-653 (WHW), 1994 U.S. Dist. LEXIS 18812, at *3 (D.N.J. Dec. 28, 1994)) (second modification in original). If SST disagrees with the Court’s assessment of its argument in its Alice brief, the proper recourse is through appeal to the Federal Circuit, as SST has noticed this Court of its intent to do.

Turning to its first position, while true that SST presented a separate argument based on DDR Holdings, SST’s argument presents a misunderstanding of DDR Holdings. SST submits that DDR Holdings stands for the proposition that the second step of the Alice test can be satisfied by either having an inventive concept or solving a computer centric problem. (See SST Mot. Br. at 2–4.) This is incorrect.

The Federal Circuit in DDR Holdings clearly stated, "[t]his second step is the search for an 'inventive concept,' or some element or combination of elements sufficient to ensure that the claim in practice amounts to 'significantly more' than a patent on an ineligible concept." 773 F.3d at 1255 (quoting Alice, 134 S. Ct. at 2355). The purpose of "or" following "inventive concept" in the preceding quote is not to turn the second step of the Alice test into a disjunctive test; rather, it serves to introduce the definition of what the "inventive concept" is.

What made the claims in DDR Holdings patent eligible was that, at Alice step two, "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." Id. at 1257. And, as pointed out by both parties, the Federal Circuit in DDR Holdings made it abundantly clear that "not all claims purporting to address Internet-centric challenges are eligible for patent." Id. at 1258 (cited by SST Mot. Br. at 5 n.5 and Kayak Opp. [Dkt. No. 308] at 10.)

For SST to now submit that its Alice briefing argued that the '328 Patent was survived Alice step two only because it solved a computer centric problem is indeed a frivolous argument based on the plain reading of DDR Holdings. The '328 Patent still needed to demonstrate an inventive concept, and the inventive concept is what SST effectively abandoned in its

Markman position, as explained by this Court in the Fee Opinion. See Fee Op., 2016 WL 1259961, at *5–7.

Further, the Court in finding the ’328 Patent invalid under 35 U.S.C. § 101 remarked that SST’s arguments were “somewhat disingenuous” as SST attempted to “set aside the ultimate direction of the patent, a clearly well-worn business practice, in order to align its case with DDR Holdings.” Source Search Techs., LLC v. Kayak Software Corp. (“Invalidity Opinion”), 111 F. Supp. 3d 603, 612–13 (D.N.J. 2015). SST submits in its Motion here that “SST’s DDR Holdings argument was in no way dependent upon SST’s cited footnote in the Patent Office documents.” (SST Mot. Br. at 5.) But as the Court explained in invalidating the ’328 Patent, SST did indeed point to predistributed software -- the same software that was “no small task” to create according to the footnote argued to the PTO -- as the inventive concept of the ’328 Patent, and that software was insufficient to bring the claims of the ’328 Patent under DDR Holdings. Invalidity Op., 111 F. Supp. 3d at 616–17. An argument relying on DDR Holdings thus still required SST to argue that the software was an inventive concept. To claim otherwise is incorrect.

The Court does not find SST’s Motion persuasive, and finds that it does not meet the high threshold required to warrant reconsideration of the Fees Opinion. SST’s Motion presents

merely disagreement with the Court's decision, and does not present any error that must be corrected to prevent a manifest injustice. SST has failed to meet its burden in the instant motion. Accordingly, reconsideration is improper.

## V. CONCLUSION

For the foregoing reasons, SST's Motion will be denied. An appropriate order accompanies this opinion.

Date: December 19, 2016
At Camden, New Jersey

___s/ Noel L. Hillman_____
NOEL L. HILLMAN, U.S.D.J.

US005758328A

# United States Patent [19]

Giovannoli

[11] Patent Number: 5,758,328

[45] Date of Patent: May 26, 1998

[54] COMPUTERIZED QUOTATION SYSTEM AND METHOD

[76] Inventor: Joseph Giovannoli, 30 Bayberry Dr., Saddle River, N.J. 07458

[21] Appl. No.: 603,906

[22] Filed: Feb. 22, 1996

[51] Int. Cl.[6] .......... G06F 7/06

[52] U.S. Cl. .......... 705/26; 705/27

[58] Field of Search .......... 395/201, 226, 395/227, 237; 705/26, 27

[56] References Cited

U.S. PATENT DOCUMENTS



| | | | |
|---|---|---|---|
| 4,734,858 | 3/1988 | Schlafly | 364/408 |
| 4,799,156 | 1/1989 | Shavit et al. | 364/401 |
| 4,922,940 | 5/1990 | Dworkin | 395/226 |
| 4,972,318 | 11/1990 | Brown et al. | 364/403 |
| 4,992,940 | 2/1991 | Dworkin | 364/401 |
| 5,077,665 | 12/1991 | Silverman . | |
| 5,136,501 | 8/1992 | Silverman et al. . | |
| 5,168,446 | 12/1992 | Wiseman | 364/408 |
| 5,237,499 | 8/1993 | Garback . | |
| 5,305,200 | 4/1994 | Hartheimer et al. . | |
| 5,309,355 | 5/1994 | Lockwood . | |
| 5,351,186 | 9/1994 | Bullock et al. . | |
| 5,361,199 | 11/1994 | Shoquist et al. . | |
| 5,375,055 | 12/1994 | Togher | 364/408 |
| 5,402,336 | 3/1995 | Spiegelhoff et al. . | |
| 5,485,370 | 1/1996 | Moss et al. . | |
| 5,500,793 | 3/1996 | Demlog, Jr. et al. . | |

OTHER PUBLICATIONS

Author unknown, IBNL Forges Into the Future of Buying and Selling with Source Interactive Software, PR Newswire, Jan. 10, 1996.

Author unknown, IBNL Announces Signing of More Than $8 Billion in Buying Power, Business Wire, Nov. 15, 1996.

*Primary Examiner*—Edward R. Cosimano
*Assistant Examiner*—Phillp Groutt
*Attorney, Agent, or Firm*—Jeffrey Kaplan

[57] ABSTRACT

A computerized system for forming a computer based communications network of network members inclusive of network buyers and or network vendors for processing requests for quotation for goods and services through at least one central processing unit including operating system software for controlling the central processing unit, storage means containing the identification of network members, means for network buyers to generate request for quotation for goods and/or services, means for transmitting said request for quotation to said central processing unit, filter means for selecting appropriate network members to receive said request for quotation based on filter conditions defined by the buyer in said request for quotation and/or by the vendor and/or by the central processing unit, means for broadcasting said request for quotation to the network members selected by said filter means and means for responding to the generator of said request for quotation with either a response to said request for quotation or with a list of said selected network members. Filter conditions may define the class of vendors in terms of geographical location, quantity, language spoken, currency, special conditions of sale, and the like.

19 Claims, 9 Drawing Sheets




SYSTEM CENTRAL COMPUTER
BUYER
VENDOR
BUYER
INTERNET COMPUTER NETWORK
BUYER
SYSTEM CENTRAL COMPUTER
VENDOR
BUYER

FIG. 1


THE PRICE QUOTATION SYSTEM PROVIDES AN INTERNET HOME PAGE FOR USERS WHO HAVE:
1. SOFTWARE TO ACCESS THE INTERNET (WORLD WIDE WEB)
2. ACCESS TO THE INTERNET VIA A LOCAL ACCESS PROVIDER
THE USER CONNECTS TO THE INTERNET AND ACCESSES THE QUOTATION SYSTEM INTERNET ADDRESS. ONCE ACCESSED, THE SYSTEM PROVIDES A LIST OF OPTIONS, ONE OF WHICH IS "DO YOU WANT TO REQUEST A PRICE QUOTATION?. THE BUYER SELECTS THIS OPTION.
THE BUYER NEXT SELECTS A PRODUCT TYPE, e.g. :
COMPUTER PRODUCTS
APPLIANCES
ELECTRONIC PARTS AND COMPONENTS
ET CETERA
THE BUYER REQUESTS A QUOTATION FOR EITHER:
A CATEGORY OF ITEMS (e.g. PERSONAL COMPUTER MONITORS); OR
A SPECIFIC ITEM (e.g. SEGATE MODEL 225 HARD DISK DRIVE)
ONCE SELECTED, THE BUYER SUBMITS THE REQUEST BY SELECTING AN OPTION ON THE INTERNET SITE REQUEST FORM.
THE QUOTATION SYSTEM PROCESSES THE REQUEST BY SELECTING A CLASS OF VENDORS WHO SELL THE REQUESTED PRODUCT(S) AND MEET THE FILTER REQUIREMENTS OF THE BUYER, VENDOR, AND THE QUOTATION SYSTEM. THE QUOTATION SYSTEM THEN MAKES AVAILABLE THE REQUEST(S) TO EACH SELECTED VENDOR VIA FILE TRANSFER PROTOCOL (FTP) OR E-MAIL.
EACH SELECTED VENDOR RESPONDS TO THE REQUEST(S) BY PROVIDING ITS PRICING AND OTHER INFORMATION TO THE QUOTATION SYSTEM. THIS IS DONE AUTOMATICALLY USING SOFTWARE PROVIDED BY THE QUOTATION SYSTEM TO EACH VENDOR. VENDOR SOFTWARE CONNECTS WITH THE QUOTATION SYSTEM ON A VENDOR DETERMINED SCHEDULE FOR THE PURPOSE OF RECEIVING REQUESTS FOR QUOTATION AND RESPONDING THERETO WITH INVENTORY AND PRICING INFORMATION EACH VENDOR KEEPS CURRENT USING THE QUOTATION SYSTEM PROVIDED SOFTWARE.

*FIG. 2A*

THE QUOTATION SYSTEM USES THE VENDOR'S QUOTATIONS TO PREPARE E-MAIL FOR THE REQUESTING BUYER. THE E-MAIL CAN BE FORMATTED USING HTML CODES TO PERMIT THE BUYER TO DISPLAY ITS E-MAIL AS IF IT WERE AN HTML PAGE. IN THIS WAY THE E-MAIL RESPONSE WILL HAVE HTML HYPERTEXT CAPABILITY AND ENABLE THE BUYER TO SELECT OPTIONS FROM THE HTML CODED E-MAIL FOR CONVENIENT PROCESSING OF THE QUOTATIONS. SUCH OPTIONS MAY INCLUDE SENDING AN ELECTRONIC PURCHASE ORDER IN RESPONSE TO A VENDORS QUOTATION AND REQUESTING THAT APPROPRIATE CREDIT INFORMATION OF THE BUYER BE PROVIDED TO THE VENDOR FROM RECORDS KEPT BY THE QUOTATION SYSTEM. APPLICATION HELPER SOFTWARE CAN BE PROVIDED BY THE QUOTATION SYSTEM TO SYSTEM MEMBERS FOR CONVENIENT PROCESSING OF HTML E-MAIL RESPONSES.

*FIG. 2B*


A VENDOR MAY POST SPECIAL SALE ITEMS TO THE QUOTATION SYSTEM VIA THE INTERNET OR OTHERWISE. IN TURN THE SYSTEM WILL FORWARD THE SPECIAL SALE OFFERS TO ANY USER WHO REGISTERS OR HAS REGISTERED THEIR INTEREST IN RECEIVING SALE OFFERS FOR THE PRODUCT OR CATEGORY BEING OFFERED BY THE VENDOR, PROVIDED THE USER MEETS THE VENDOR'S AND THE QUOTATION SYSTEM'S FILTER REQUIREMENTS.
FOR EXAMPLE, COMPUTER CITY COMMUNICATES TO THE QUOTATION SYSTEM A SPECIAL SALE ON IBM TYPE PERSONAL COMPUTER MONITORS.
IF A SYSTEM MEMBER PRE-REGISTERED ITS INTEREST IN RECEIVING OFFERS FOR PERSONAL COMPUTER MONITORS (e.g. VIA THE QUOTATION SYSTEM'S INTERNET SITE), THE SYSTEM WILL E-MAIL THE COMPUTER CITY SALE INFORMATION TO THE SYSTEM MEMBER'S E-MAIL ADDRESS PROVIDED THE MEMBER IS LOCATED IN A VENDOR SPECIFIED AREA.

*FIG. 3*


BUYER
REQUESTS FOR QUOTES,
SPECIAL SALE REQUESTS AND
MEMBERSHIP APPLICATIONS
SUPPORTING DATA,
WEB PAGES AND
ITEM SELECTIONS
PROCESS VENDOR SELECTIONS,
RFQs, REFERENCE DATA,
ACCOUNTING, ECT.
PROCESSED RESPONSES TO RFQs
WORD WIDE
WEB
CENTRAL
OFFICE
E-MAIL
NEW VENDOR
ACCOUNT REQUESTS
QUOTATIONS
SPECIAL SALES
PRODUCT CATEGORY INFO.
FILTER CRITERIA
VENDOR PROFILE DATA
REQUESTS FOR QUOTES
SOFTWARE UPDATES
PRODUCT
DATABASE
VENDOR
FTP

FIG. 4


GET RFQ
CREATE EMPTY TABLE TO HOLD VENDORS THAT WILL BE SELECTED FOR THIS RFQ. (tmp_SELECTED TABLE)
GET ITEM AND ITS SUB CATEGORY CODE ALONG WITH THE BUYER'S AREA CODE CITY CODE, CURRENCY CODE AND BUYER TYPE CODE.
RESET ITEM HIT COUNTER TO ZERO
NOTE: THIS IS DONE IN A SINGLE SELECT
ITEM FOUND ?
YES
NO
POPULATE FTP FILES OF VENDORS SELECTED FOR THIS RFQ
DROP THE TABLE OF SELECTED VENDORS. (tmp_SELECTED)
GET A VENDOR FROM tmp_SELECTED TABLE THAT CARRIES THE SUB CATEGORY TO WHICH THIS ITEM BELONGS. ORDER BY PRIORITY THEN POSITION
VENDOR FOUND ?
YES
NO
INCREMENT HIT COUNTER
HAS THE PER ITEM HIT QUOTE BEEN MET ?
YES
NO
B
GENERATE LIST OF QUALIFYING VENDORS ORDERED BY POSITION.
A
1. THEY DEAL WITH BUYER,S BUYER TYPE
2. THEY QUOTE IN THE BUYER,S CURRENCY
3. THEY CARRY THE ITEM'S SUB CATEGORY.
4. THEY COVER THE BUYERS REGION (AREA CODE OR COUNTRY CODE.)

FIG. 5



A
B
GET QUALIFIED VENDOR FROM LIST
VENDOR FOUND ?
NO
GENERATE "NO VENDORS FOUND" LETTER TO BUYER FOR THE ITEM.
YES
HAS THIS VENDOR ALREADY BEEN SELECTED FOR THIS RFQ ?
YES
NO
INCREMENT THE HIT COUNTER FOR THIS ITEM.
ADD VENDOR TO THE LIST OF VENDORS SELECTED OR THIS RFQ. (tmp_SELECTED TABLE)
CALCULATE NEW QUE POSITION FOR THE VENDOR
UPDATE VENDOR'S QUE POSITION AND STATISTICS
HAS HIT QUOTE BEEN MET FOR ITEM ?
NO
YES


*FIG. 6*

SAMPLE BUYER'S DATA PACKET

- BUYER'S IDENTIFICATION (CODE)
- TRACKING NUMBER
- DATE AND TIME
- PRODUCT IDENTIFICATION
- QUANTITY
- SHIP METHOD
- SHIP DESTINATION
- VENDOR QUALIFICATIONS (FILTER CONDITIONS)
- BUYER'S NOTES

NOTE: BUYER'S FILTER CONDITIONS MIGHT INCLUDE LANGUAGE SPOKEN, CURRENCY OF QUOTATION, TYPE OF VENDOR (e.g. MANUFACTURER, DISTRIBUTOR, RETAILER, ECT.), OR LOCATION OF THE VENDOR.

VENDOR ADDS TO THE DATA PACKET

- VENDORS IDENTIFICATION (CODE)
- QUOTATION NUMBER
- QUOTATION DATE
- QUOTATION EXPIRATION
- PRICE PER UNIT
- TOTAL PRICE
- TAXES
- SHIPPING CHARGE
- DELIVERY TIME
- VENDOR'S NOTES

NOTE: VENDOR'S FILTER QUALIFICATIONS FOR BUYERS CAN BE REGISTERED WITH THE QUOTATION SYSTEM CENTRAL OFFICE IN ADVANCE ENABLING THE CENTRAL OFFICE TO FILTER BUYER'S RFQS AND PROVIDE VENDORS WITH FILTER QUALIFIED BUYERS.

*FIG. 7*

PRICE QUOTATION

| | |
|---|---|
| RFQ DATE: 07/02/1993 | TRACKING NO : 1016 |
| PROD. TYPE NO. : 12432 | ROUTING TO : NEW JERSEY |
| PROD. CATEGORY : RESISTORS | PROD. CODE : 4800 |
| PRODUCT NAME : TYPE J RESISTOR 5% | |
| PRODUCT NUMBER : OH006-2000656 | |
| MANUFACTURER : OHMITE | |
| QUANTITY : 5,000 PIECES | DELIVERY DATE : 08/01/1993 |
| NOTES : DELIVERY DATE IS FIRM. | |

| | | |
|---|---|---|
| QUOTE DATE : 07/03/1993 VENDOR NO. : 456546 | | |
| VENDOR NAME : ACME RESISTIOR SUPPLY, INC. | | |
| CONTACT : JOHN MURRAY | UNIT PRICE : | 0.28 |
| VENDOR PHONE : 515 222-3333 | 5,000 PIECE = | 1,400.00 |
| VENDOR FAX : 515 222-3056 | SALES TAX : | 0.00 |
| CAN SHIP BY : 07/03/1993 | UPS GROUND : | 26.00 |
| | = | ======== |
| | | 1,426.00 |

VENDOR NOTES : SHIPPED 1000 PER BOX FROM INVENTORY, SUBJECT TO PRIOR SALE.

ACCEPT/REJECT QUOTE :

*FIG. 8*

# COMPUTERIZED QUOTATION SYSTEM AND METHOD

## FIELD OF THE INVENTION

This invention relates generally to a computerized system forming a computer based communications network of buyer and vendor members for processing requests for quotation for goods and/or services from network members or their representatives and for linking buyers to sellers through the computer based communications network of network members having means for selectively controlling the linkage between network members in accordance with filter conditions of the buyers and/or sellers as well as filter conditions established by the computerized system. The filter conditions determine which of the network sellers will receive a buyer's request for quotation. More particularly this invention relates to a computerized system forming a computer based communications network between network members having filter means for controlling the communication linkage between such network members based upon chosen filter conditions set up by the network members and the system to satisfy one or more requests for quotation from the network members.

## BACKGROUND OF INVENTION

Buyers in need of goods and services often spend considerable time locating an appropriate vendor. Buyers use trade publications, directories, recommendations, and other means to locate vendors. If the type of vendor needed is in a foreign country, the problem compounds. Vendors advertise through various media and by direct sales methods to make known to potential buyers what they sell and how to contact them. Once a buyer identifies a few vendors, each must be contacted to obtain product or service price and availability information. This is a time consuming process and companies typically rely on experienced purchasing staff to accomplish it. In addition, when buyers must sell surplus inventory from time to time they must advertise, cold call, sell to brokers or the like. These processes are costly and time consuming for most businesses.

The prior art describes computerized shopping systems which employ some kind of central database of goods and services offered to buyers. Information about the goods and services offered is stored centrally and must be kept current centrally. The volume of information required to be maintained and updated in a central database system restricts it to a limited type or number of goods and services or number of vendors it can offer. It is not feasible for such systems to provide access to all standard goods and services and all suppliers world wide. For such a central database to exist, the amount of information to be stored would be awesome as would be the task of keeping it current. It simply is not feasible for central database systems to satisfy the need of buyers to receive timely quotes on an enormous variety of goods and services from vendors anywhere in the world. For this reason existing centralized database systems are created and maintained by the one or a few vendors whose goods and prices are displayed. These systems necessarily restrict a buyer's choice of vendors.

These systems are like electronic supermarkets which are owned by a single company or an association of suppliers. In such systems a vendor provides its database of goods and/or services to a buyer who orders items from the vendor's database. It is analagous to walking into a vendors store and selecting items from the vendors available stock. Another such system is analogous to shopping in a mall. In



this case a number of (complementary) vendors combine to offer their collective inventory to the buyer through individual databases or a combined database of available goods or services. In yet another existing system a primary seller, such as an insurance agency, offers to provide buyers premium quotations from the insurance carriers for which the agency is an agent.

In all of the above cases the vendors responding to the buyers request regarding a particular good or service are either the service provider or a vendor with whom the service provider is involved in another business relationship such as advertisers in a common publication or affliated insurance carriers. These select vendors provide the product and pricing information supplied by the system to buyers. These systems have no capacity to offer an unlimited number of goods and services from any number of vendors who wish to become members of the system. This would require an unrealistically large central database containing information about products, services and vendors. Each vendor would be required to provide detailed information to the central database about its product lines and would be required to update them daily. Accordingly, existing systems are very specialized electronic buying services with a limited selection of goods, services, and vendors. In addition, buyers wishing to sell surplus inventory from time to time cannot use these systems for that purpose.

The present invention is analagous to a cross between telephone and broadcasting technologies. It is this difference which creates the opportunity for buyers to relate to vendors without a rigid structure operating through a centralized computer database as required by existing methods.

## SUMMARY OF THE INVENTION

The present invention is a computerized system forming a computer based communications network for processing requests for quotation for goods and/or services by broadcasting such requests to network members of the computerized system over any conventional transmitting medium, such as the Internet, to which the computerized system may be connected. No central database of goods, prices, etc. is involved. Instead, buyers formulate requests for quotation and transmit them to the computerized network which broadcasts the request for quotation of one or more specified standard products to prospective sellers based on filter conditions set by the buyer and/or the seller and/or the network operator. The filter compatible sellers' responses are communicated to the prospective buyer either over the communications network or via other acceptable communications means. Their responses are processed by the quotation system and submitted to the requesting buyer.

The method of the present invention processes requests for quotation for goods and/or services from a buyer or supplier of goods and/or services through a computerized system forming a computer based communications network of network members for linking buyers to suppliers with the computerized system having at least one central processing unit including operating system software for controlling the central processing unit and storage means containing the identification of the network members, wherein the method comprises a computerized system receiving a buyer's request for quotation over a communication network; selecting one or more appropriate vendors to receive the buyer's request for quotation based on filter conditions, if any, set by the buyer, vendor and the network software; transmitting or making available the buyer's request for quotation to said selected vendors over a communications network; and said

selected vendors communicating their quotations either directly to the buyer or to the computerized system which in turn makes available or transmits said received quotations to the requesting buyer.

The computerized system of the present invention forms a computer based communications network for processing requests for quotation for goods and/or services through at least one central processing unit with said computerized system comprising operating system software for controlling the central processing unit and storage means containing appropriate identity and other information about members of the network, means for potential buyers of product and/or services to transmit a request for quotation to said central processing unit, means for said central processing unit to selectively broadcast or make available said request for quotation to selected network vendor members, means for said vendor members to respond directly to the requesting buyer or to said central processing unit and means for transmitting or making available from said central processing unit vendor's quotations to the requesting potential buyers.

## BRIEF DESCRIPTION OF THE DRAWINGS The following detailed description may best be understood by reference to the following description in conjunction with the accompanying drawings in which:

FIG. 1. shows a network diagram of the computerized system of the present invention where the Internet is the communications network;

FIG. 2. shows a block diagram representing how a buyer interacts with the computerized system of this invention via the Internet;

FIG. 3. is a block diagram of how a vendor's offer of items for special sale is communicated to network buyer members;

FIG. 4. is a data flow diagram linking vendors and buyers to a hypothetical central office arranged to demonstrate an embodiment of the quotation system of this invention;

FIG. 5. and FIG. 6. show logic for processing requests for quotation such that all filter conditions are met and a predetermined number of vendor responses are returned to the requesting buyer;

FIG. 7. shows a hypothetical list of options for use in preparing requests for quotation to be routed over the network. It is one embodiment of data structures suitable for buyers and vendors to interact via the quotation system network of this invention;

FIG. 8. shows a hypothetical illustration of a request for quotation.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention is a computerized quotation system forming a computer based communications network for processing requests for quotation for goods and services from respective buyers or vendors who broadcast such requests to network members of the computerized system. There is no central pricing database to limit the number of buyers and vendors of goods and services or to limit the number of goods and services which can be processed. However the goods and services must be standard items to ensure that there is no confusion as to what buyers are requesting and what sellers are offering to buyers. FIG. 1 shows the system of this invention as configured using the Internet as the communications network.



A network member is anyone or any company which has registered as a user by completing an application and can be a buyer and/or a vendor in using the services provided by the computerized system of the present invention. The programming (e.g. Internet HTML pages or quotation system provided software) which enables network members to interact with the network would include information sufficient for network members to identify standard goods or services that they wish to identify in a request for quotation. Standardization of product or service descriptions is essential to avoid confusion unless a more text oriented specification is appropriate to the product or service type. To this end preprogrammed menu information is provided to classify product and services in catagories broken down by functional class and subclass corresponding to the products as they are commercially known and identified. Such menus are readily upgraded to include new and revised commercially available products and services from the manufactures or suppliers of such products and services. Buyers would use this information to prepare requests for quotation which will then be clearly understood by vendors. This product and other information and programming or software could be made available to network members either by direct electronic transfer to the user's personal computer or by providing information, software, or data on computer disks, compact disks, or other appropriate means. Providing standardized information to network users is necessary to correlate product and service identifications for buyers and vendors among other system maintenance functions. FIG. 4 shows how information would flow in an Internet embodiment of this invention. The quotation system central office would maintain its Internet site HTML pages and other necessary items by communication with its HTML World Wide Web server. It would download from the Web site requests for membership as well as requests for quotation. The Central Office would process RFQs through appropriate software and would wait for vendors to contact the Central Office FTP site. Vendors would use quotation system supplied software to cross reference their inventory to link with product lists used by the quotation system. When contacted the Central Office would acquire via suitable vendor software the RFQ information required and available from the vendors product database. If the vendor has prepared information relating to special sales, this information would be transferred to the Central Office at this time. Software version and list upgrades would be performed as well. When the FTP transfers are complet, the Central Office would prepare RFQ e-mail for requesting buyers and forward same as required.

New vendors may apply for membership using the quotation system's World Wide Web application form or by contacting quotation system offices by other means. Buyer members would access the quotation system's World Wide Web site and apply for membership or request price quotations or other available information, such as a trade publication search engine or statistical charts of price versus time by product, provided through the quotation system's Web site. New members would receive password information via e-mail to ensure that applicants have provided correct e-mail coordinates.

The invention can be understood readily from the following description of the preferred embodiment in conjunction with the flow diagram of FIG. 2 in which communication between buyers, sellers and the network computer(s) is completed using the Internet. A World wide Web home page is set up to provide access to the network by Internet members. A potential user accesses the Internet using any

standard Web browser and becomes a quotation network user by completing a registration application providing necessary data about itself. Once registered, a member can access the forms necessary for preparing a request for quotation ("RFQ"), which will be described in greater detail hereafter. The RFQ is subsequently downloaded to a quotation system central office computer through a file transfer protocol (FTP) connection to the Internet Web server.

The RFQ is then processed to select vendors who are capable of quoting on the RFQ and who meet any other conditions set by the requesting buyer (e.g. language, currency, or vendor location). In addition, vendors may "deselect" themselves from quoting on certain types of RFQs by registering their preferences with the quotation system to avoid receiving RFQs of certain types. The buyer and vendor filters may represent in their simplest form defined classes of suppliers and/or buyers and may extend to delineate conditions of sale and/or purchase. Limitations or conditions included in the RFQ and/or in the response are defined for purposes of the present application as filter information or simply "filters". Filtering performed by a quotation system computer may simply involve limiting the network members to whom the RFQ is given and/or to whom responses are given or may be a more complex selection process. Part of the process of selecting vendors involves quotation system business arrangements and other considerations. An example of this would be providing vendors varying categories of service which may require prioritizing the vendors according to a formula. In this way, by the category of service they choose, vendors may determine the percentage of RFQs they receive from a given number received by the quotation system. FIG. 5 and FIG. 6 show sample logic for processing filter conditions to accomplish vendor selection for a given RFQ. FIG. 7 shows hypothetical buyer and vendor information items which could comprise the RFQ data packet.

Once vendors are selected to receive RFQs, the RFQ information may be transmitted to them via FTP over the Internet, however, a preferred way would be to provide vendors with software which permits them to schedule when they wish to communicate with the quotation system. In this case, the vendor software would contact the quotation system over the Internet via FTP; the quotation system would interrigate the vendor's product database (using suitable software which links or cross references the vendor's inventory to the quotation system product and services lists) and retrieve pricing and other information necessary to respond to the RFQ; and thereafter prepare e-mail to be sent to the requesting buyer member. FIG. 8 shows one possible arrangement of RFQ data which would be e-mailed to a buyer. In this example a request for quotation is sent for 5,000 OH006-2000656 type J resistors manufactured by Ohmite for delivery by Aug. 1, 1993. The buyer indicates that the delivery date is firm. Other information such as RFQ date, tracking number and product code are shown. In this case the sender has specified that this request for quotation be routed to vendors in the state of New Jersey USA only. The lower portion of FIG. 6. shows a response from for example Acme Supply, Inc. together with pricing, contact information, delivery and vendor notes indicating that the request can be "Shipped 1000 per box from inventory, subject to prior sale."The e-mail could be configured as HTML pages and read as HTML by the buyer's browser directly or via application helper software provided by the quotation system. One advantage to providing buyers with HTML type e-mail quotations is that hypertext links can be embedded in the quotation along with data about the quotation which would permit the buyer to select a response option directly from the quotation HTML page. The option may be to request that an e-mail purchase order be sent to a vendor and that the buyer's credit information, e.g. on file with the quotation system, be used to effectuate automatically a credit purchase of the quoted product. Other alternatives include providing quotations to buyers via FTP or through interaction with the quotation system World Wide Web Internet site. As an alternative, communications between buyers and sellers may be by telephone, e-mail or other means.

Shipping companies can be included in the process if a credit purchase conditions the vendor's payment on confirmation from the shipper that the delivery has been received and accepted by the buyer. The quotation system would verify the buyer's credit and notify the vendor of the purchase order and credit code. When the vendor ships the package using a participating shipper and the buyer accepts the goods, the shipper would communicate the delivery acceptance to the quotation system computer or directly to the credit provider to permit release of funds to the vendors account. This would be particularly useful in international transactions.

Although the above example uses the Internet as the communications network between buyers, sellers and the quotation system computer, other computer communications arrangements can be used as well. Also, although the quotation computer system may execute all functions using one node on a communications network, it is equally suitable to have multiple nodes at many sites to service all network users. FIG. 1 shows two such quotation system central computers. In this event, all nodes would intercommunicate as required to complete routing of user information and other functions.

The quotation system computer is schmatically shown in FIG. 4 as the "Central Office" and includes a random access memory for temporary storage of information, a read only memory for permanent storage of the computers configuration and basic operating commands, an input/output adapter for connecting peripheral devices and known input and interface devices. Visual output is provided by display adapters and display devices. The network computer is controlled by one or more central processing units which may include a conventional microprocessor and a number of other units interconnected via a system bus. Any operating system may be resident on the computer. Programming for the buyer's and vendor's computer type equipment would be appropriate to the variety of goods and services buyers and vendors wish to sell over the network and would change as new goods and services come into existence and old ones are discontinued. FIG. 3 shows in block diagram a process by which vendors may offer items "on sale" to quotation system buyers. In this case, buyers will be informed of the sale if they identify or have identified the product or its category to the quotation system and provided the vendor has defined filter conditions which include the buyer in the class of buyers to which the vendor wishes to communicate its "on sale" offer.

Limiting the class of recipients may be used by large organizations to communicate exclusively to other members of their organization. For example, large corporations may make special sale offers exclusively to their employees. Alternatively, general users can offer to donate products exclusively to charitable or not for profit organizations.

The process of the present invention begins when a buyer prepares a network compatible request for quotation (RFQ).

The buyer additionally may prepare or has previously prepared a definition of the class of vendor to receive the request. The request or requests are telecommunicated to a quotation network computer and is thereafter routed to the specified class of vendors consistent with network software and vendor requirements or conditions, if any. Vendors in the defined class respond to the buyer's request for quotation and the buyer may purchase from a responding vendor. The number of vendors within the specified class will depend on the buyer's class specification. For example, a buyer who specifies vendors of volt meters in New York State will reach more vendors than if New York City alone were specified. Such class specifications are information filters through which only the desired vendors can pass. By joining the network, all vendors are potential class members no matter where in the world they are located. In addition, a vendor may choose to filter out requests for quotation for other than a vendor defined class of requests for quotation, e.g., requests must be for at least 10,000 pieces or for goods produced by a specific manufacturer. The computerized system may also add a filter, for example, to reflect the type of service selected by the buyer and/or vendor. The network computer's filter may time sequence routing of the buyer's request based on the vendor's distance from the buyer's location. This would give vendors with the lowest shipping charges earlier access to the buyer's request and would give the buyer an opportunity to cancel further routings of its request if responses indicate that more distant vendors are not likely to provide more competitive quotes than those already received.

When a vendor wants to receive requests for quotation over the network, the vendor notifies the network of the class of goods or services in which the vendor deals (a "request for quotation class definition"). This can be communicated by voice, telephone, fax, et cetera, or by use of programming provided for that purpose but the preferred method is to use programming provided for that purpose by the network. The request for quotation class definition is transmitted to the network and the network uses that definition to filter all requests for quotation routed to the vendor, i.e., to the class defined by a buyer of which the vendor is a member. In this way the vendor receives only those requests for quotation which conform to the vendor's request for quotation definition. The number of vendors within a class to receive a request for quotation may be very large. To keep the process manageable network software may be arranged to limit the number of vendors to receive a request for quotation.

By using the present invention, a network member buyer in Frankfurt, Germany who requests a quotation for an electronic part may receive quotations within minutes from previously unknown network member vendors in Cupertino, Calif. and Kyoto, Japan.

Where appropriate, programming would enable the user to receive, review, and reply to responses from network users. Programming would be tailored to the various types of request for response network users require. Users can be buyers and/or vendors. When a user wants to buy something, the programming for preparing a request for quotation is invoked on the user's computer or computer like device. When a user wants to sell something, a request for quotation class definition is prepared using programming provided for that purpose. A typical situation in which a user who is predominantly a buyer may choose to be a vendor is when the user overstocks an item and chooses to resell the surplus inventory via the network. To sell surplus inventory without the network of this invention requires advertising, word of mouth, cold calling, sale to a broker or the like. In addition, the network software could be arranged to enable vendors to donate unwanted equipment, et cetera, to charity network members. In addition, the network filters could be defined to permit intra organizational notices of availability or requirements for products or services, especially in large distributed corporations or governmental agencies.

The network is a routing service with the routing being controlled by class description filters which can be specified by the buyer, the network computer, and the vendors. By analogy, it is like a cross between a telephone call and a radio broadcast where the ultimate recipient is neither an individual nor a mass audience, but a class of recipients identified by their characteristics. In the preferred embodiment the vendor class of network members are filtered to be selected based on their likelihood to respond to the request for quotation. Alternatively, or in addition, the vendor responses may likewise be filtered to satisfy conditions of the vendors responding or in accordance with predefined conditions for facilitating a linkage between the prospective buyer and an acceptable seller.

What we claim is:

1. A computerized system for forming a computer based communications network of network members inclusive of network buyers and or network vendors for processing requests for quotation for goods and services through at least one central processing unit including operating system software for controlling the central processing unit, said network members being remotely located from said central processing unit and connected thereto via a communications channel storage means containing identification of the network members, means for network buyers to generate request for quotation for goods and/or services, means for transmitting said request for quotation to said central processing unit, filter means for filtering the network members in said storage means to determine which network members are to receive said request for quotation based upon filter conditions set up by the network buyer in said request for quotation or by the central processing unit in accordance with preestablished conditions, means for broadcasting said request for quotation to the network members selected by said filter means and means for responding to the generator of said request with either a response from the selected network members or with a list of said selected network members for said generator of said request to establish independent communication.

2. A computerized system as defined in claim 1 wherein said network members communicate via the Internet through said central processing unit.

3. A method for processing requests for quotation for goods and/or services from a party representing a buyer or supplier of goods and/or services through a computerized system forming a computer based communications network of network members for linking buyers to suppliers with the computerized system having at least one central processing unit including operating system software for controlling the central processing unit and storage means containing the identification of the network members, wherein the method comprises the steps of:

receiving a buyer's request for quotation over a communication network;

selecting one or more appropriate vendors to be sent the buyer's request for quotation based upon filter conditions, set by the buyer, vendor and the network software; transmitting the buyer's request for quotation separately to said selected vendors over said communications network; and with said selected vendors communicating their quotations either directly to the buyer

or to the computerized system which in turn transmits said received quotations to the requesting buyer.

4. A computerized system for engaging in transactions over a data network. said computerized system comprising:

a plurality of terminals. at least one of which being designated a requestor and others of which are designated vendor terminals;

filter and broadcast means for receiving. over said data network. requests from said requestor to engage in transactions with unspecified vendor terminals. and for filtering said requests to determine with which vendor terminals said requests should be matched; and

means for matching said requests with vendor terminals which meet predetermined filter conditions for generating quotes from information contained in a database associated with said vendor terminals. and for accepting said quotes from said vendor terminals. wherein the central database contains information that is insufficient to consummate the transaction.

5. The computerized system of claim 4 further comprising means for communicating responses from said vendor terminals to said filter and broadcast means; and

means at said filter and broadcast means for communicating a selected set of said responses to said requestor.

6. The computerized system of claim 5 wherein said transaction is a purchase. and wherein the purchase may comprise a plurality of items.

7. The system of claim 6 further comprising: means for establishing communications between said filter and broadcast means and said vendor terminals which meet said filter conditions; and means for determining whether a quote for said transaction from a particular vendor terminal meeting said filter conditions should be sent to said requestor.

8. The method of claim 7 wherein said communications is continuous.

9. The method of claim 7 wherein said communications is periodic.

10. The method of claim 9 wherein said communications is initiated by said vendor terminal.

11. The apparatus of claim 4 wherein further comprising means for automatically notifying a buyer when particular items meeting specified conditions become available from a seller.

12. A method of purchasing goods or services over a data network comprising the steps of:

communicating. over said data network. to a filter means. at least one request for a quotation from a potential buyer of said goods or services;

filtering. at said filter means. the at least one request in order to ascertain a set of sellers potentially capable of supplying said goods or services; and

obtaining. from at least one of said potential sellers. over a data network. quotes to supply said goods or services. and forwarding said quotes to said potential buyer. wherein at least part of the quote information is stored at a location remote from said filter means.

13. The method of claim 12 further comprising the step of accepting filtering conditions from said potential buyer. and utilizing said filtering conditions in said step of filtering to determine a subset of potentially capable sellers.

14. The method of claim 13 wherein said set is limited by said filter conditions and by a predetermined maximum number from which a bid is to be received.

15. The method of claim 12 wherein said step of obtaining comprises the step of each seller contacting said filter means at predetermined intervals and supplying bids in response to any requests for proposal that have arrived at said filtering means and that were determined. by the filter means. to be a request for proposal for goods or services which said each seller is potentially capable of supplying.

16. The method of claim 12 wherein said step of obtaining comprises the step of automatically and periodically supplying the filter means with information sufficient to assemble a bid. and then assembling such bid in response to a request for a bid. and sending the bid to said potential buyer via e-mail.

17. A method of matching buyers of goods and services with sellers of goods and services over a data network comprising the steps of;

communicating. from buyers to a filter means. requests for quotes (RFQs);

filtering said RFQs so that only sellers meeting a first set of filter conditions receive said RFQs;

transmitting. to remotely located seller databases. the filtered RFQs;

accepting quotes from sellers meeting said first set of filter conditions. and filtering said quotes so that only quotes meeting additional filter conditions are sent to a buyer requesting said quotes.

18. The method of claim 17 wherein said additional filter conditions are determined by said vendor.

19. The method of claim 17 wherein said additional filter conditions are determined by said filter means.

* * * * *

US005758328C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (9569th)

**United States Patent** (10) **Number: US 5,758,328 C1**

**Giovannoli** (45) **Certificate Issued: Mar. 21, 2013**

(54) **COMPUTERIZED QUOTATION SYSTEM AND METHOD**

(75) Inventor: **Joseph Giovannoli**, Saddle River, NJ (US)

(73) Assignee: **Source Search Technologies, LLC**

**Reexamination Request:**
No. 90/011,857, Aug. 11, 2011

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **5,758,328** |
| Issued: | **May 26, 1998** |
| Appl. No.: | **08/603,906** |
| Filed: | **Feb. 22, 1996** |

(51) **Int. Cl.**
***G06Q 30/06*** (2006.01)

(52) **U.S. Cl.**
USPC ........................................ **705/26.4**; 705/26.43

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/011,857, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Jalatee Worjloh

(57) **ABSTRACT**

A computerized system for forming a computer based communications network of network members inclusive of network buyers and or network vendors for processing requests for quotation for goods and services through at least one central processing unit including operating system software for controlling the central processing unit, storage means containing the identification of network members, means for network buyers to generate request for quotation for goods and/or services, means for transmitting said request for quotation to said central processing unit, filter means for selecting appropriate network members to receive said request for quotation based on filter conditions defined by the buyer in said request for quotation and/or by the vendor and/or by the central processing unit, means for broadcasting said request for quotation to the network members selected by said filter means and means for responding to the generator of said request for quotation with either a response to said request for quotation or with a list of said selected network members. Filter conditions may define the class of vendors in terms of geographical location, quantity, language spoken, currency, special conditions of sale, and the like.



# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **17-19** are cancelled.

Claims **4** and **12** are determined to be patentable as amended.

Claims **5-11** and **13-16**, dependent on an amended claim, are determined to be patentable.

New claims **20-31** are added and determined to be patentable.

Claims **1-3** were not reexamined.

**4**. A computerized system for engaging in transactions over a data network, said computerized system comprising:

*a central database;*

a plurality of terminals, at least one of which being designated a requestor and others of which are designated vendor terminals;

filter and broadcast means for receiving, over said data network, requests from said requestor to engage in transactions with unspecified vendor terminals, and for filtering said requests to determine with which vendor terminals said requests should be matched; and

means for matching said requests with vendor terminals which meet predetermined filter conditions for generating quotes from information contained in a database associated with said vendor terminals, and for accepting said quotes from said vendor terminals, wherein the central database contains information that is insufficient to consummate the transaction.

**12**. A method of purchasing goods or services over a data network comprising the steps of:

communicating, over said data network, to a filter means, at least one request for a quotation from a potential buyer of said goods or services;

filtering, at said filter means, the at least one request *for quotation* in order to ascertain a set of sellers potentially capable of supplying said goods or services; and

obtaining, from at least one of said potential sellers *previously ascertained by said filtering said request for quotation*, over a data network, quotes to supply said goods or services, and forwarding said quotes to said potential buyer, wherein at least part of the quote information is stored at a location remote from said filter means.



*20. A method of purchasing goods or services over a data network comprising the steps of:*

*communicating, over said data network, to a filter means, at least one request for a quotation from a potential buyer of said goods or services;*

*filtering, at said filter means, the at least one request for quotation in order to ascertain a set of sellers potentially capable of supplying said goods or services; and*

*obtaining, by said filter means, responsive to said filtering, from at least one of said potential sellers, over a data network, quotes to supply said goods or services, and forwarding said quotes to said potential buyer, wherein at least part of the quote information is stored at a location remote from said filter means.*

*21. The method of claim 12 further comprising embedding, in said quote, a link from which said potential buyer may facilitate a purchase of the good or service directly from said seller.*

*22. The method of claim 21 wherein said link is a hypertext link.*

*23. The method of claim 12 wherein said obtaining comprises utilizing software which automatically retrieves pricing and other material terms of an offer from a database associated with at least one of said sellers.*

*24. The method of claim 12 wherein said obtaining comprises obtaining said quotes via an Internet website.*

*25. The method of claim 12 wherein said communicating is in response to a buyer accessing an Internet website.*

*26. The method of claim 12 further comprising the step of distributing, to the buyer, pre-programmed menu information for use in preparing the requests for quotation.*

*27. The method of claim 26 further comprising the step of distributing, to the seller, software for use in responding to requests for quotation.*

*28. The computerized system of claim 4 further comprising means for notifying a potential buyer via email of special sales.*

*29. The method of claim 12 further comprising notifying the potential buyer via email of special sales.*

*30. The method of claim 12 further comprising providing vendors varying categories of service by prioritizing said vendors according to a formula.*

*31. The method of claim 30 wherein said prioritizing comprises time sequence selected sellers based upon prescribed criteria.*

* * * * *

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on January 6, 2017
by:

- ☐ U.S. Mail
- ☐ Fax
- ☐ Hand
- ☒ Electronic Means (by E-mail or CM/ECF)

| Jeffrey I. Kaplan | /s/ Jeffrey I. Kaplan |
|---|---|
| Name of Counsel | Signature of Counsel |

| | |
|---|---|
| Law Firm | Kaplan Breyer Schwarz & Ottesen, LLP |
| Address | 100 Matawan Road |
| City, State, Zip | Matawan, New Jersey |
| Telephone Number | 732 578 0103 |
| Fax Number | 732 578 0104 |
| E-Mail Address | jkaplan@kbsolaw.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

   __X__ The brief contains 9787 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

   _____ The brief uses a monospaced typeface and contains _______ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedures 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   __X__ The brief has been prepared in the proportionally spaced typefacing using MS Word 1997-2003 in a 14 point Times New Roman font or

January 6, 2017

______________________________
Jeffrey I. Kaplan
Attorney for Appellant